Roy H. BRAY, Appellant,

v.

Kenneth C. SQUIRES, Miller H. Walsh, Jeffrey J. Tompkins, P.C., University Savings Association, Richard Collier, Entex., Inc., and Jackson Hinds, Appellees.

No. 01–84–0264–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 27, 1985.

John D. Payne, Houston, for appellant.

Martin D. Beirne, Sawnie A. McEntire, Gilpin, Maynard, Parsons, Pohl & Bennett (Suzanne B. Baker and Sherry M. Merfish, Gilpin, Maynard, Parsons, Pohl & Bennett, of counsel), and Elaine B. Bristow, Mayor, Day & Caldwell, Houston, for appellees.

Before EVANS, C.J., and COHEN and LEVY, JJ.

## OPINION

EVANS, Chief Justice.

This controversy arose when the appellees, Messrs. Squires, Walsh, and Tompkins, resigned as associates of the law firm of the appellant, Roy H. Bray, and immediately engaged themselves, as a new firm, in performing legal work for Mr. Bray's principal client, University Savings Association. Several days later, Mr. Bray sued appellees Squires, Walsh, and Tompkins, alleging that they had breached their fiduciary duty to him and that they had interfered with and damaged his business relationship with University Savings. In this same action, Mr. Bray also sued University Savings, its president and chairman of the board, Mr. Richard Collier, and one of its directors, Mr. Jackson Hinds, who was also chairman of the board and chief executive officer of Entex, Inc. In his petition, Mr. Bray alleged that Messrs. Collier and Hinds had wrongfully induced his former employees, Squires, Walsh, and Tompkins, to terminate their employment, and that in participation with those employees, Messrs. Collier and Hinds had damaged his business relationship with University Savings.

The case was tried before a jury, which answered all controlling issues contrary to Mr. Bray's position. In response to the

issues submitted, the jury failed to find that Messrs. Squires, Walsh, and Tompkins had breached any fiduciary relationship between themselves and Mr. Bray, or that Messrs. Hinds and Collier participated in any breach of such fiduciary relationship. The jury also failed to find that Messrs. Squires, Walsh, or Tompkins, in concert or individually, had interfered with or conspired to interfere with any business or contractual relationship between Mr. Bray and University Savings. The jury further failed to find that either Mr. Hinds or Mr. Collier had wrongfully induced Messrs. Squires, Walsh, and Tompkins to terminate their employment with Mr. Bray.

The jury did find that Mr. Hinds had committed acts that interfered with the business relationship between Mr. Bray and University Savings, and that such interference proximately caused damage to that relationship. However, the jury failed to find that Mr. Hinds' actions were motivated by malice; to the contrary, it found that such actions were undertaken to achieve legitimate business or personal goals. Based on the jury's verdict, the trial court entered a take-nothing judgment against Mr. Bray.

Mr. Bray first contends that the evidence established, as a matter of law, that Messrs. Squires, Walsh, and Tompkins breached their fiduciary duty to him, and that the jury's contrary finding on that issue is against the great weight and preponderance of the evidence.

Mr. Bray testified that his law firm was primarily engaged in real estate matters and that he first performed legal services for University Savings in 1968. This new business resulted from his acquaintance with Mr. John Jobes, then president and chief executive officer of University Savings, and with Mr. Robert S. Lanier, who at that time owned both Main Bank and a controlling interest in University Savings. At the same time that Mr. Bray began to *work* for University Savings, he hired appellee Miller Walsh as an associate attorney. Mr. Walsh began doing legal work for University Savings, and as the compa-

ny's business expanded, Mr. Walsh became engaged in more sophisticated real estate transactions. In 1971, Mr. Bray employed appellee Kenneth Squires, and over the course of his work for University Savings, Mr. Squires developed expertise in dealing with condominium and townhouse transactions. Mr. Bray later retained appellee Jeffrey J. Tompkins, a nephew by marriage to Mr. Jackson Hinds, and Mr. Tompkins also performed legal work for University Savings. There was no written employment contract between Mr. Bray and these associates, and all three lawyers were employed on the basis of an oral understanding. In June 1977, Messrs. Squires, Walsh, and Tompkins advised Mr. Bray that they were resigning from the firm, and that they intended to perform future legal services for University Savings. Although they indicated to Mr. Bray that they would be willing to remain an additional 30 days to wind up pending matters, he instructed them to leave immediately.

Mr. Bray testified that he had no written contract with University Savings, but that he did have a general fee understanding with respect to his legal services. After Messrs. Squires, Walsh, and Tompkins resigned, Mr. Bray found that his firm's commercial work for University Savings ceased almost entirely, and that within a few months, most of his residential work also terminated. Before then, his firm's gross revenue from University Savings amounted to $250,000 to $360,000 per year. When Walsh and Tompkins came to his office on Monday, June 6, 1977, they advised him that they were resigning and "taking your largest client with us." Mr. Bray said he doubted whether they could do that "at that time," due to his long relationship with University Savings. To that statement, Mr. Tompkins responded, "My Uncle Jackson has called us. Everything is go. He told us we could come in and tell you now that we are leaving and we are taking your largest client." Several days later, Mr. Bray talked to Mr. Collier at a business reception. He testified that Mr. Collier advised him that there would be no change in the "substantial representation" of Univer-

sity Savings, and that Mr. Bray's departing associates would merely be referred some consumer transactions and other matters not then being handled by Mr. Bray's firm. But later at the same function, Mr. Bray talked to Mr. Hinds and received a different explanation. Bray said that Mr. Hinds made it "absolutely clear" that his firm would not be receiving any more legal business from University Savings.

Mr. Hinds testified that he had talked to his nephew, Mr. Tompkins, some months before his nephew's resignation from Mr. Bray's employment. He knew that his nephew was dissatisfied with his situation at Mr. Bray's firm, and he advised his nephew of the possibility of future legal work from University Savings. But he told his nephew that this arrangement was conditioned on several things. First, Entex would have to acquire the controlling interest in University Savings; second, the proposed arrangement would have to be agreeable to Mr. Collier, the president of University Savings; and finally, the arrangement would have to be fair to both parties, and there would be no guarantee of the amount of future legal business to be referred by University Savings. When Mr. Hinds later learned that the Entex acquisition had been approved and that Mr. Collier had agreed to the proposal, he advised his nephew that he felt the first two conditions had been met. Mr. Hinds further testified that because Mr. Bray had a substantial financial interest in a competing savings institution, San Jacinto Savings Association, he felt that Mr. Bray had a conflict of interest that prevented him from continuing to represent University Savings. Mr. Hinds stated that due to this conflict of interest, he would not have permitted Mr. Bray's representation of University Savings to continue after Entex acquired the controlling interest in that company.

Messrs. Squires, Walsh, and Tompkins testified they left Mr. Bray's employment because of their dissatisfaction with the employment relationship. Each felt there was little hope of becoming a partner in the firm, and also felt dissatisfaction about salary and other benefits. Illustrative of this sentiment is Tompkins' testimony:

Q. What was it specifically that you were dissatisfied with, will you please tell us?

A. I guess the dissatisfaction stemmed from a combination of events.

But one of the things, of course, had to do with the incident with the note being ripped up in my face while I'm on a long distance call trying to solve a client's problem.

That was the kind of culmination of things in the sense that I knew here was a person I wasn't going to be able to work with on a long time basis.

I liked to work there. I enjoyed very much the work there.

And then some other events, there were some discussions that Mr. Bray's son was going to be coming onboard. I knew that he had a younger son than even Steve Bray who would probably could be following up, and that concerned me about how they would relate to the law firm and what that would do for me.

Later on I discovered, and I was not aware of this, that Mr. Holiday had a right to come up from the title company at any time and become a chief lawyer, which again created doubts in my mind what my future was there. There seemed to be a lot of people in front of me, or possibly a lot of people in front of me.

Mr. Bray had made a comment one time that he had had all the partners he wanted. He wasn't going to have any more partners, and all of this started coming together around the end of '76, '77. And the early part of '77 I decided that other than experience, that's probably all I was going to get out of this job and that I needed to be thinking about the future.

Q. And you feel, then, by the early part of '77 you had some serious plans in your mind that you needed to be somewhere else?

A. Well, that's correct. I had pretty much in my mind—pretty much made up

my mind that this was short time and it simply depended on whether the available opportunities came up.

At the time of their resignations, Messrs. Walsh and Squires were each earning $30,000 annually, and Mr. Tompkins was earning $18,400 per year. Each denied solicitating University Savings for future business before resigning from Mr. Bray's firm.

■ It is every lawyer's ethical responsibility to maintain the highest standards of professional conduct. This is true, not only in the lawyer's dealings with his client and the public in general, but also in his relationship with other members of the bar, including his own partners and associates. A basic tenet of a lawyer's professional responsibility is that "every person in our society should have ready access to the independent professional services of a lawyer of integrity and competence." State Bar of Texas, Ethical Considerations on Code of Professional Responsibility EC 1-1 (1973). Because of a lawyer's special position in society, even minor wrongdoing tends to lessen the public's confidence in the legal profession. Thus, a lawyer is expected to refrain from any conduct that creates the impression of dishonesty, fraud, or deceit. Supreme Court of Texas, Rules Governing the State Bar of Texas art. X, sec. 9 (Code of Professional Responsibility) DR 1-102 (1984) (formerly art. XII, sec. 8 (Code of Professional Responsibility) DR 1-102 (1973)); State Bar of Texas Ethical Considerations EC 1-5.

■ A fiduciary relationship existed between Mr. Bray and his associates, Messrs. Squires, Walsh, and Tompkins. Accordingly, during the course of their relationship, each lawyer had a duty to deal openly and to make full disclosure to the other members of the firm about matters affecting the firm's business. Indeed, this duty was an incident to the parties' employer-employee relationship. *See Cook v. Brundidge, Fountain, Elliott & Churchill*, 533 S.W.2d 751 (Tex.1976); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509 (1942).

■ In Texas, either an employer or an employee may terminate the employment relationship at any time, for any reason, unless there is a specific contractual agreement to the contrary. *Mitsubishi Aircraft International, Inc. v. Maurer*, 675 S.W.2d 286, 289 (Tex.App.—Dallas 1984, no writ); *Maus v. National Living Centers, Inc.*, 633 S.W.2d 674, 675 (Tex.App.—Austin 1982, writ ref'd n.r.e.). Absent some special circumstances, once an employee resigns, he may actively compete with his former employer. *Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 476 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r.e.).

■ Messrs. Squires, Walsh, and Tompkins could not, of course, compete with Mr. Bray during their employment relationship with him. If these gentlemen had, during the course of that relationship, used their positions to gain a business opportunity belonging to Mr. Bray, such conduct would constitute an actionable wrong. *MPI, Inc. v. Dupre*, 596 S.W.2d 251, 254 (Tex.Civ. App.—Fort Worth 1980, writ ref'd n.r.e.). But Messrs. Squires, Walsh, and Tompkins were not precluded by their relationship with Mr. Bray from making preparations for a future business venture among themselves, and the fact that they may have planned to engage in competition with Mr. Bray did not necessarily constitute a breach of their fiduciary duties. *Id.* at 254; *see also Herider Farms—El Paso, Inc.*, 519 S.W.2d at 476.

■ Although there is some evidence from which it might be inferred that Messrs. Squires, Walsh, and Tompkins, before terminating their employment relationship with Mr. Bray, improperly communicated with University Savings about future representation, there was also testimony from which a contrary inference could be drawn. The issue was, therefore, a matter for the jury's determination. The jury could reasonably have determined that Messrs. Squires, Walsh, and Tompkins decided to leave Mr. Bray's employ due to their dissatisfaction with him as an employer, and that they did not solicit the business

of University Savings during their employment relationship with Mr. Bray. We have not been referred to any evidence in the record that supports Mr. Bray's contention that Messrs. Squires, Walsh, and Tompkins took any pending matters with them, or that their new firm billed University Savings or any other client for work that had been performed while they were employed by Mr. Bray. Neither do we find any substantial evidence that supports the claim that Messrs. Squires, Walsh, and Tompkins reproduced and took with them extensive forms and documents belonging to Mr. Bray.

■ If a lawyer knows that a prospective client has previously obtained counsel, he may not ethically accept employment in the matter unless the other counsel approves or withdraws, or the client terminates the prior employment. State Bar of Texas Ethical Considerations EC 2–30. To accept employment when the prior attorney-client relationship has not been terminated constitutes a violation of the Canons of Professional Ethics. *See* State Bar of Texas, Comm. on Professional Ethics, Op. 395 (1973); *see also* 7 C.J.S. *Attorney and Client* sec. 81 (1980). In this case, the evidence does not compel the conclusion that Messrs. Squires, Walsh, and Tompkins violated the Canons of Professional Ethics in accepting employment from University Savings after resigning from Mr. Bray's firm.

We conclude that the evidence does not support Mr. Bray's assertions that he is entitled, as a matter of law, to affirmative findings on Special Issues 1, 3, 5, and 6, and we further find that the jury's answers to said issues are not against the great weight and preponderance of the evidence. We therefore overrule Mr. Bray's points of error one, two, three, four, nine, ten, eleven, and twelve.

We also overrule Mr. Bray's points of error five, six, seven, and eight in which he contends that the evidence established, as a matter of law, that Mr. Hinds and Mr. Collier wrongfully induced Messrs. Squires, Walsh, and Tompkins to terminate their employment with Mr. Bray, and that the jury's answers to Special Issues 17 and 19 are contrary to the great weight and preponderance of the evidence.

■ Under certain circumstances, an actionable wrong may be committed if a third party induces another's employees to breach their contract of employment, for the purpose of obtaining the employees as his own or with the intent to injure the former employer. *Custom Drapery Co. v. Hardwick*, 531 S.W.2d 160, 166 (Tex.Civ. App.—Houston [1st Dist.] 1975, no writ). But it must be shown that the third party's interference was the proximate cause of the breach of relationship, *Diesel Injection Sales & Services, Inc. v. Renfro*, 656 S.W.2d 568, 573 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.), and there is no actionable wrong if the employees act on their own initiative. *Custom Drapery Co. v. Hardwick*, 531 S.W.2d at 166.

In this case, the jury was entitled to believe the testimony indicating that Messrs. Squires, Walsh, and Tompkins decided to leave Mr. Bray's employ due to their personal dissatisfaction with him as an employer, and that they made this decision without any definite assurance of receiving future legal work from University Savings. There was testimony from which the jury could have inferred that Mr. Hinds represented to Mr. Tompkins only the probability of receiving some business from University Savings, and that the fact or extent of such legal representation was never discussed until after Messrs. Squires, Walsh, and Tompkins had resigned from Mr. Bray's firm. We cannot say that the affirmative of these issues was established as a matter of law, or that the jury's answers to the issues were against the great weight and preponderance of the evidence. We accordingly overrule points of error five, six, seven, and eight.

We move to a consideration of Mr. Bray's remaining contentions, which are based upon the jury's findings to Special Issues 5 and 6, that Mr. Hinds interfered with the business relationship between Mr. Bray and University Savings, and that such

interference proximately caused damage to such relationship. The jury found, in response to Special Issue 8, that Mr. Hinds' actions were undertaken to achieve legitimate business or personal goals, and it did not find, in response to Special Issue 7, that his actions had any malicious purpose.

Mr. Bray attacks the legal definition of "malice," as used in the court's charge. He also contends that the evidence established, as a matter of law, that Mr. Hinds' interference was not undertaken to achieve legitimate business or personal goals, and that the jury's response to Special Issue 8 is against the great weight and preponderance of the evidence. We overrule these contentions.

■ Under Texas law, a cause of action does exist in tort for the wrongful interference with an advantageous business relationship. *Martin v. Phillips Petroleum Co.*, 455 S.W.2d 429 (Tex.Civ.App.—Houston [14th Dist.] 1970, no writ). But unless there is some contractual understanding, a party to a business relationship is not protected from lawful competition, only against malicious or unlawful interference. *Id.* at 435. Therefore, interference with a business relationship is actionable only if illegal action and malice combine to produce an injury. *State National Bank of El Paso v. Farah Manufacturing Co.*, 678 S.W.2d 661, 688–89 (Tex.App.—El Paso 1984, writ dism'd). Malice, in its legal sense, characterizes an act with an unlawful purpose, done intentionally, without just cause or excuse. *Id.* It is not necessary, in such a case, to show that there was ill-will, spite, or other evil motives. *See also Herider Farms-El Paso, Inc.*, 519 S.W.2d at 476.

Here, there was no contract or other basis that prevented University Savings from changing lawyers if and when it desired. Mr. Hinds acted entirely within the scope of his official duties on behalf of University Savings and of its parent corporation, Entex, Inc., in moving to discharge Mr. Bray as the attorney representing University Savings and in selecting new legal representation for University Savings.

■ A client has the absolute right to discharge an attorney at any time, with or without cause, *see Hume v. Zuehl*, 119 S.W.2d 905, 907 (Tex.Civ.App.—San Antonio 1938, writ ref'd), and in the absence of some vested interest in the res, the discharged attorney has no further rights in the matter. Here, the jury expressly found that Mr. Hinds' actions were undertaken to achieve legitimate business or personal goals, and it refused to find that his actions were motivated by malice. Although Mr. Bray now complains of the definition of malice given in the court's charge, no objection to the definition was made at the time of trial. Therefore, any error has been waived. *Dodson v. McCoy*, 601 S.W.2d 128, 130 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ); *Ennis Business Forms, Inc. v. Gehrig*, 534 S.W.2d 183 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.); Tex.R. Civ.P. 272, 274. We accordingly overrule points of error five, six, seven, eight, thirteen, fourteen and fifteen, and we also overrule point of error sixteen, which complains of the court's refusal to award damages based on these issues.

The judgment of the trial court is affirmed.