Opinion issued December 29, 2005 




 













In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-03-00130-CV
__________
 
GUY J. DANIEL, INDIVIDUALLY AND D/B/A GUY J. DANIEL
CONSTRUCTION CO. AND LESHA DANIEL, INDIVIDUALLY AND
D/B/A JA-LE & ASSOCIATES, Appellants
 
V.
 
FALCON INTEREST REALTY CORPORATION, Appellee
 

 
 
On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 9843268
 

 
 
O P I N I O N
          Appellants, Guy J. Daniel, individually and doing business as Guy J. Daniel
Construction Company, and Lesha Daniel, individually and doing business as Ja-Le
& Associates (collectively, “the Daniels”), challenge the trial court’s judgment,
entered after a bench trial, in appellee, Falcon Interest Realty Corporation’s
(“Falcon”), breach of fiduciary duty suit against the Daniels. The trial court awarded
Falcon $191,000, less a $70,000 settlement credit. In four issues, the Daniels contend
that (1) the trial court erred in finding that they breached their fiduciary duty; (2) the
trial court erred in denying their summary judgment motion; (3) the loss of the entire
clerk’s record unduly burdened them because “the trial court’s docket sheet notes are
crucial to appellate review”; and (4) Falcon is equitably estopped from recovering
from the Daniels because Falcon profited from the acts of the Daniels. 
          We affirm. 
Factual and Procedural Background
          Jack Moss, Falcon’s chief financial officer, testified that Falcon hired Guy to
serve as the project manager and on-site superintendent of a construction project
referred to by the parties as the “State of Texas Job.” Falcon paid Guy a salary for
serving as project manager and on-site superintendent. As project manger, Guy was
responsible for locating subcontractors, soliciting bids, setting the scope of work for
each subcontractor, reviewing the bids, and letting the contracts. As superintendent,
Guy was responsible for overseeing people working on the project.


 Guy would
normally select the subcontractor for each portion of the project and notify Falcon’s
president of construction. Guy would also receive invoices, approve them, and
forward them to the accounting department.
          Near the completion of the project, and after Guy was “pulled off” the project,
Falcon found approximately one million dollars worth of invoices in a drawer that
had not been reported to Falcon. Falcon ended up losing over one million dollars on
the project. After completion of the project, Falcon learned that B&L Associates
(“B&L”), one of the subcontractors that performed work on the project, was run by
Guy’s mother-in-law and father-in-law. Guy had not disclosed this information to
Falcon. Falcon subsequently learned, after reviewing bank records, that Guy and his
wife Lesha personally profited from the operation of B&L. Falcon had paid B&L
approximately $373,000 for its work on the project, but, after learning of the
relationship between Guy and B&L, did not pay B&L for the final $16,000 billed by
B&L. 
          On cross-examination, Moss admitted that, at least in one other instance, a
family member of a Falcon employee had worked as a subcontractor for Falcon, but
Moss also noted that Falcon was aware of the relationship and that the Falcon
employee did not receive any compensation as a result of this relationship. 
          Sharon Henry, a certified public account and an expert witness for Falcon,
testified that she reviewed the records of bank accounts held in the names of B&L
Associates and Ja-Le & Associates and that these accounts had received $372,945
from Falcon for the project. She also calculated disbursements from these accounts
for, among other things, subcontractor expenses, wages, overhead, and insurance, and
she determined that there had been a profit earned on the project “in the range of
$200,000.”
          Beverly Laine, Guy’s mother-in-law, testified that Guy approached her and her
husband and asked them if they “would be interested in doing something on the side”
so that they “could make some money” and he “could save Falcon money.” In
response, she and her husband formed B&L for the purpose of bidding on work on
the project. Laine stated that she handled all the books and records for B&L, that she
opened a bank account for B&L, and that she and her husband were the only
signatories on the B&L bank account. She further stated that while B&L may have
paid some of the labor costs associated with work performed by B&L on the project,
she wired money, per Guy’s instructions, to Guy’s business account, held in the name
of Ja-Le & Associates, and Guy made arrangements to pay employees and
subcontractors for work on the project. After B&L completed its work on the project,
Laine prepared and submitted the invoices to Falcon. On cross-examination, Laine
stated that B&L completed all of its work on the project and that no one from Falcon
complained about the quality of B&L’s work. She further stated that B&L submitted
bids on certain jobs that were not accepted by Falcon. 
          Lesha Daniel testified that, after marrying Guy, she created the assumed name
of Ja-Le & Associates for the purpose of providing the Daniels “with additional
income on some side jobs.” She stated that Ja-Le had an agreement with B&L to
provide labor and handle costs associated with the project. After forming Ja-Le, she
opened a bank account for Ja-Le, and stated that B&L had transferred money into the
Ja-Le bank account. Funds in the Ja-Le bank account were used to pay employees
and subcontractors who worked on the project, but Lesha and Guy also made
withdrawals from the account, and Lesha and Guy used funds in the account for
personal use. Falcon presented evidence that B&L had transferred approximately
$277,000 to the Ja-Le bank account. 
          Guy presented evidence that, in obtaining bids for each portion of the project,
he received bids from three different contractors, and that B&L’s bids were less than
some of the other bids submitted. Guy testified that Falcon paid B&L $372,945 for
work on the project. Guy admitted making a profit off of Falcon through B&L of
approximately $200,000, excluding a loan he made to a colleague, which he did not
believe constituted a part of B&L’s profits. Guy agreed that he helped oversee the
B&L employees on the project. In closing, Guy contended that if he and Lesha were
held liable by the trial court, “under existing case law,” they benefitted $70,000, and
that they would be entitled to offsets against this amount.
          Falcon brought suit against the Daniels and Guy’s mother-in-law and father-in-law, doing business as B&L, for breach of fiduciary duty, conspiracy, fraud, and
tortious interference with contractual and business relationships. Falcon settled with
Guy’s mother-in-law and father-in-law, doing business as B&L, and proceeded to
trial on its breach of fiduciary duty claim against the Daniels. After a bench trial, the
trial court entered judgment, awarding Falcon $191,000, less a settlement credit of
$70,000. The trial court also entered the following pertinent findings of fact:2.[Guy] worked as a project site superintendent on a project for
which [Falcon] was the general contractor. [Guy] also served as
project manager for the same project. . . . The [project] became
known as the State of Texas Job . . . .
 
          3.       As part of [Guy]’s job function he received and reviewed
proposals and bids from subcontractors. He was instrumental in
determining which subcontractors would be selected for work on
the [project]. In some cases, he awarded subcontracts to
subcontractors.
 
          . . . .
 
          6.       [Guy] and [Lesha] were instrumental in the creation, operation
and work of [B&L], including the preparation of all bids and
proposals for work . . . on the [project]. However, the names
associated with [B&L] in public records were that of [Guy’s in-laws].
  
          7.       [Guy] did not inform the principals of [Falcon] about his
connection with [B&L] and his involvement in the preparation
and proposals for subcontracts on the [project] at the time they
were submitted. 
 
          . . . .
 
          10.     [B&L] opened a bank account . . . (the “B&L Bank Account”).
 
          . . . .
 
          12.     [Lesha] created the entity known as [Ja-Le] . . . .
 
          13.     [Ja-Le] opened a bank account . . . (the “Ja-Le Bank Account”).
 
          14.     [Ja-Le] worked with [B&L] in performing the work on the
subcontract for the [project]. [Ja-Le] paid the employees who
performed the labor on the subcontract with Falcon . . . .
 
          . . . .
 
          21.     [Guy] supervised the employees of [B&L] on the [project] site.
 
          22.     [Guy] ordered materials on behalf of [B&L] which were delivered
to the [project].
 
          23.     [Guy] accepted delivery of materials ordered by [B&L] on the
[project].
 
          24.     At all times [Guy] was performing services for [B&L], he was an
employee of [Falcon].
 
          25.     [Guy] did not inform [Falcon] of his work for [B&L] on the
[project] at the time the work was being performed. 
 
 . . . .
 
          27.     [B&L] submitted invoices to [Falcon] in the amount of $389,447.
 
          28.     [Falcon] paid [B&L] $372,945.00.
 
          29.     [B&L] deposited all of the monies received from [Falcon] into the
B&L Bank Account.
 
          30.     Subcontractors and invoices for materials used on the [project]
were paid from both the B&L Bank Account and the Ja-Le Bank
Account.
 
          31.     [B&L] transferred by wire transfer the sum of $277,000 for the
B&L Bank Account to the Ja-Le Bank Account at the instruction
of either [Lesha] or [Guy].
 
          32.     The actual cost of materials and labor incurred by [B&L] and/or
[Ja-Le] for the subcontracting work performed on or materials
purchased and delivered to the [project] was approximately
$191,000.
 
          33.     The difference between the amount paid to [B&L] and/or [Ja-Le]
and the amount actually incurred by [B&L] and/or [Ja-Le] in
materials and labor was approximately $181,000.
 
          34.     But for approximately $11,000 paid to the principals of [B&L],
the balance of the profit received on the [project] by [Ja-Le] was
used by [Guy] and/or [Lesha] for their personal use.
 
          35.     [Lesha] withdrew $68,880 in cash from the Ja-Le Bank Account.
 
          36.     [Guy] withdrew $10,350 in cash from the Ja-Le Bank Account.
 
          37.     [Lesha] and/or [Guy] spent approximately $55,000 in money from
the Ja-Le Bank Account for items such as furniture, cars, tires,
computers, scuba equipment, groceries and credit card statements.
 
          38.     A relationship of trust and confidence existed between [Guy] and 
[Falcon].
 
          39.     [Lesha] knew of the relationship of trust and confidence between
[Guy] and [Falcon].
 
          40.     The transactions between [B&L] and Falcon were not fair or
equitable to [Falcon].
 
          41.     [Guy] used his position of confidence with [Falcon] to his
personal advantage.
 
          42.     [Guy] did not act in good faith and did not exhibit honesty in his
transactions with [Falcon] in connection with the subcontract
awarded to [B&L].
 
          43.     [Guy] placed himself in a position where his self-interest
conflicted with his obligations as a fiduciary to [Falcon].
 
          44.     [Guy] used his position to gain a personal benefit at the expense
of Falcon.
 
          45.     [Guy] did not fully and fairly disclose all important information
regarding [B&L] to [Falcon] in connection with the [project].
 
          46.     [Guy] made material omissions of fact and information in the
course of his employment with [Falcon], which omissions
cause[d] Falcon economic damage and resulted in the unjust
enrichment of [Guy].
 
          47.     [Lesha] conspired with [Guy] in omitting information which was
material to [Falcon] and which resulted in economic damage to
[Falcon] and the unjust enrichment of [Lesha] and [Guy].
 
          The trial court also entered the following conclusions of law:
 
          1.       [Guy] owed a fiduciary duty to [Falcon].
 
          2.       [Guy] breached his fiduciary duty to [Falcon].
 
          3.       [Guy’s] breach of fiduciary duty was material.
 
          4.       [Guy’s] profit as a result of his breach of fiduciary duty was
approximately $191,000.
 
          5.       [Lesha] conspired with [Guy] to breach his fiduciary duty to
[Falcon].
 
          6.       [Lesha] knowingly participated in the breach of fiduciary duty
committed by [Guy].
 
          7.       [Guy] and [Lesha] are jointly liable to [Falcon] for the damages
suffered as a result of the breach of fiduciary duty.
 
          8.       [Guy] and [Lesha] must disgorge the profit they received as a
result of their breach of fiduciary duty owed to [Falcon] . . . .
 
          9.       [Guy] and [Lesha] are entitled to a credit for settlement by the
other . . . joint tortfeasors. 
Standard of Review
          In an appeal of a judgment rendered after a bench trial, the trial court’s findings
of fact have the same weight as a jury’s verdict, and we review the legal and factual
sufficiency of the evidence used to support them, just as we would review a jury’s
findings. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); In re K.R.P., 80
S.W.3d 669, 673 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). When
challenged, a trial court’s findings of fact are not conclusive if, as in the present case,
there is a complete reporter’s record. In re K.R.P., 80 S.W.3d at 673; Amador v.
Berrospe, 961 S.W.2d 205, 207 (Tex. App.—Houston [1st Dist.] 1996, writ denied). 
When a party without the burden of proof at trial challenges the legal sufficiency of
the evidence, we consider all of the evidence in the light most favorable to the
prevailing party, indulging every reasonable inference in that party’s favor. Assoc.
Indus. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285–86 (Tex. 1998). If there
is any evidence of probative force to support the finding, i.e., more than a mere
scintilla, we will overrule the issue. Formosa Plastics Corp. USA v. Presidio Eng’rs
& Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998). In our review of the factual
sufficiency of the evidence, we must consider and weigh all of the evidence, and we
will set aside a verdict only if the finding is so against the great weight and
preponderance of the evidence, that it is clearly wrong and unjust. Ortiz v. Jones, 917
S.W.2d 770, 772 (Tex. 1996). We review a trial court’s conclusions of law de novo. 
In re Moers, 104 S.W.3d 609, 611 (Tex. App.—Houston [1st Dist.] 2003, no pet.). 
We independently evaluate a trial court’s conclusions to determine their correctness,
and we will uphold conclusions on appeal if the judgment can be sustained on any
legal theory supported by the evidence. Id.
Breach of Fiduciary Duty
          In their first issue, the Daniels argue that the trial court erred in finding that
they breached their fiduciary duty and that disgorgement of profits was improper
because “no position adverse to the employer existed in the transactions.” 
Specifically, the Daniels note that Guy obtained three bids from three contractors on
each portion of the project, that the bids submitted by B&L were less than some of
the other bids, that the quality of the work was acceptable to Falcon, and that Falcon
saved money because of the Daniels’ actions. 
          The Daniels do not clearly identify any specific findings of fact or conclusions
of law that they contend were made in error. However, the Daniels’ challenges
concern the trial court’s (1) findings of fact regarding Guy’s breach of his fiduciary
duty to Falcon, and (2) conclusion of law that the Daniels must disgorge the profits
they received as a result of Guy’s breach of his fiduciary duty to Falcon.
            The term “fiduciary” generally applies “to any person who occupies a position
of peculiar confidence towards another,” refers to “integrity and fidelity,” and
contemplates “fair dealing and good faith.” Kinzbach Tool Co. v. Corbett-Wallace
Corp., 138 Tex. 565, 571, 160 S.W.2d 509, 512 (1942). In addressing the scope of
a fiduciary duty in the context of an agency relationship, the Texas Supreme Court
has observed
The agreement to act on behalf of the principal causes the agent to be a
fiduciary, that is, a person having a duty, created by his undertaking, to
act primarily for the benefit of another in matters connected with his
undertaking. Among the agent’s fiduciary duties to the principal is the
duty to account for profits arising out of the employment, the duty not
to act as, or on account of, an adverse party without the principal’s
consent, the duty not to compete with the principal on his own account
or for another in matters relating to the subject matter of the agency, and
the duty to deal fairly with the principal in all transactions between
them.
Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 200 (Tex. 2002) (quoting
Restatement (Second) of Agency § 13, cmt. a (1958)). 
          Citing Johnson, our Court has held that “[w]hen a fiduciary relationship of
agency exists between employee and employer, the employee has a duty to act
primarily for the benefit of the employer in matters connected with his agency.” 
Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.]
2003, no pet.). We also noted that an agent who serves as a fiduciary owes his
principal the duty not to compete with the principal on his own account in matters
relating to the subject matter of the agency, as well as the duty to deal fairly with the
principal in all transactions between them. Id. at 510. Additionally, a fiduciary has
a duty to deal openly and to fully disclose to his employer information that affects his
employer’s business. Id.; see also Kinzbach Tool Co., 160 S.W.2d at 513 (“It is the
duty of a fiduciary to deal openly, and to make full disclosure to the party with whom
he stands in such relationship.”). Furthermore, an agent who uses his position to gain
a business opportunity belonging to the employer commits an actionable wrong. 
Abetter Trucking Co., 113 S.W.3d at 510 (citing Bray v. Squires, 702 S.W.2d 266,
270 (Tex. App.—Houston [1st Dist.] 1985, no writ)).
          Falcon presented evidence that Guy, who was hired to serve as a project
manager and on-site superintendent for the project and who was responsible for
soliciting bids, setting the scope of work for each subcontractor, reviewing the bids,
letting the contracts, and overseeing people working on the project, occupied a
position of peculiar confidence towards Falcon and owed Falcon a fiduciary duty.


 
Falcon also presented evidence that, after Falcon hired Guy, Guy solicited his mother-in-law and father-in-law to form B&L to bid on and perform work for the project in
order to “make money on the side,” that Guy and Lesha were involved in the
operation of B&L, that Guy approved bids and paid invoices submitted by B&L and
supervised B&L employees at the project, and that Guy never disclosed his
relationship with B&L to Falcon. 
          After the project was completed, Falcon discovered that Guy received funds
from B&L, and Falcon presented evidence that Guy and Lesha personally profited
from the work B&L performed on the project in the amount of approximately
$200,000. Moreover, Guy admitted to making a profit off of Falcon through B&L,
and further admitted that the profit would amount to approximately $200,000,
excluding consideration of a loan that Guy contended should not be treated as a part
of B&L’s profits. 
          Guy’s argument that his efforts were for the benefit of Falcon is misplaced. 
The record reveals that Guy formed B&L for the express purpose of personally
profiting from the project, over and above the salary he was being paid by Falcon to
serve as the project manager and superintendent. While Guy contends that he did this
for the benefit of Falcon, he never disclosed his relationship with B&L. Additionally,
Guy’s argument that the quality of the work performed by B&L was acceptable to
Falcon is irrelevant. As a fiduciary, Guy had the duty to act primarily for the benefit
of Falcon, not himself, in matters connected with the project, and he also had the duty
to deal fairly and openly with Falcon and to fully disclose to Falcon information
affecting Falcon’s business. Regardless of whether Falcon was satisfied with the
quality of B&L’s work, information that Guy would be required to disclose to Falcon
would necessarily include that he and his wife were heavily involved in the creation
and operation of B&L, including the preparation of bids and proposals for work to
be performed on the project, and, more significantly, that he and his wife were
reaping a substantial profit from such work.  
          In regard to the trial court’s conclusion of law that the Daniels must disgorge
the profit they received as a result of Guy’s breach of fiduciary duty owed to Falcon,
the Daniels assert that Falcon did not complain about the quality of work performed
by B&L and B&L was less costly than other bidders. The Daniels further assert that,
in the trial court, Falcon “did not complain . . . that the defendants benefitted, only the
amount of the benefit” and that Falcon conceded, in closing argument, it would have
“gladly paid them and paid a reasonable profit.”


 Finally, the Daniels argue that
Falcon does not have standing to sue for disgorgement because Falcon benefitted
from the Daniels’ actions by passing “the costs along to the ultimate user after
marking the charges up by eight percent.”
          A fiduciary must account for, and yield to the beneficiary, any profit he makes
as a result of his breach of fiduciary duty. Int’l Bankers Life Ins. Co. v. Holloway,
368 S.W.2d 567, 576–77 (Tex. 1963). In Kinzbach Tool Co., the Texas Supreme
Court addressed, and disposed of, arguments similar to those presented by the
Daniels. In that case, a competitor of Kinzbach Tool Company (“Kinzbach”)
contacted a “trusted employee” of Kinzbach and offered the employee a secret
commission if he would negotiate the sale of the competitor’s product to Kinzbach
for a minimum price. 160 S.W.2d at 510–11. The competitor instructed the
employee not to reveal to Kinzbach the minimum price that the competitor was
willing to accept. Id. During negotiations, the employee never revealed to Kinzbach,
his employer, the minimum price the competitor was willing to accept, nor did he
reveal his commission arrangement with the competitor. Id. After the deal was
consummated, Kinzbach learned of the commission, fired the employee, and brought
suit against the employee and the competitor. Id. In finding for Kinzbach, the court
stated                     It is beside the point . . . to say that Kinzbach suffered no damages
because it received full value for what it has paid and agreed to pay. A
fiduciary cannot say to the one to whom he bears such relationship: You
have sustained no loss by my misconduct in receiving a commission
from a party opposite to you, and therefore you are without remedy. It
would be a dangerous precedent for us to say that unless some
affirmative loss can be shown, the person who has violated his fiduciary
relationship with another may hold on to any secret gain or benefit he
may have thereby acquired. It is the law that in such instances if the
fiduciary takes any gift, gratuity, or benefit in violation of his duty, or
acquires any interest adverse to his principal, without a full disclosure,
it is a betrayal of his trust and a breach of confidence, and he must
account to his principal for all he has received.
 
Id. at 514; see also Siegrist v. O’Donnell, 182 S.W.2d 403, 405 (Tex. Civ. App.—San
Antonio 1944, writ ref’d) (holding that agent who agreed to accept $2,000 profit from
person with whom he was dealing on behalf of his “unsuspecting principal” must
disgorge that profit).
          We hold that the evidence was legally and factually sufficient to support the
trial court’s finding that Guy owed a fiduciary duty to Falcon and that Guy breached
that duty. Accordingly, we further hold that the trial court did not err in entering
findings of fact that Guy breached his fiduciary duty to Falcon and conclusions of law
requiring the Daniels to disgorge their profits resulting from Guy’s breach of his
fiduciary duty.
          We overrule the Daniels’ first issue.               
Appeal of Denial of Summary Judgment
          In their second issue, the Daniels contend that the trial court erred in denying
their summary judgment motion on the ground that they did not breach a fiduciary
relationship with Falcon. The Daniels note that Falcon never filed a response or
controverting evidence in response to their summary judgment motion.  
          When a party moves unsuccessfully for summary judgment and subsequently
loses in a conventional trial on the merits, the denial of that motion generally is not
subject to review on appeal. Ackermann v. Vordenbaum, 403 S.W.3d 362, 365 (Tex.
1966); Reese v. Duncan, 80 S.W.3d 650, 665 (Tex. App.—Dallas 2002, pet. denied);
Johns v. Ram Forwarding, Inc., 29 S.W.3d 635, 638–39 (Tex. App.—Houston [1st
Dist.] 2000, no pet.). The Daniels do not present an explanation, and the record does
not support an argument, as to why this Court should not follow the application of the
general rule in this case. Accordingly, we hold that the Daniels have presented
nothing for our review on this issue.
         We overrule the Daniels’ second issue.
Missing Docket Sheet
          In their third issue, the Daniels contend that the loss of the entire clerk’s record
unduly burdened them because “the trial court’s docket sheet notes are crucial to
appellate review.” The Daniels assume that the docket sheets, if located, would
include notes explaining the calculation of damages awarded to Falcon, and that
“examination of the method of calculation of those damages is crucial to appeal.”
          However, an “appellate court may not consider docket entries since they are
only made for the clerk’s convenience and are usually unreliable.” Rush v. Barrios,
56 S.W.3d 88, 95 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); see also
Miller v. Kendall, 804 S.W.2d 933, 944 (Tex. App.—Houston [1st Dist.] 1990, no
writ). Accordingly, even if the docket sheets could be located, and, even assuming
that the sheets contain notations concerning the calculation of damages, we would not
accept any such notations as findings of fact and conclusions of law, nor would we
consider any such information in our appellate review.



            We overrule the Daniels’ third issue. 
Equitable Estoppel
          In their fourth issue, the Daniels contend that Falcon is equitably estopped from
recovering from the Daniels because Falcon profited from the acts of the Daniels. 
The Daniels assert that Falcon did not complain about the quality of work performed
by the Daniels or the cost of such work. The Daniels further assert that, because
Falcon has acted in “bad faith, committed fraud in the inducement, and further acts
of wrongful conduct,” Falcon is not entitled to the extraordinary equitable remedy of
profit disgorgement. Finally, the Daniels assert that Falcon would be unjustly
enriched if it was allowed to disgorge profits from the Daniels.
          First, we note that equitable estoppel is an affirmative defense and must be
pleaded. Tex. R. Civ. P. 94. The Daniels did not plead equitable estoppel in the trial
court, and, accordingly, they may not assert it on appeal. See City of Univ. Park v.
Van Doren, 65 S.W.3d 240, 251 (Tex. App.—Dallas 2001, pet. denied); Trevino v.
Houston Orthopedic Ctr., 831 S.W.2d 341, 344–45 (Tex. App.—Houston [14th Dist.]
1992, writ denied). Second, even if the affirmative defense of equitable estoppel was
tried by consent, as the Daniels assert in their reply brief, the Daniels have not
properly briefed this issue. An appellate brief “must contain a clear and concise
argument for the contentions made, with appropriate citations to authorities and to the
record.” Tex. R. App. P. 38.1(h). “Rule 38 requires [a party] to provide us with such
discussion of the facts and the authorities relied upon as may be requisite to maintain
the point at issue.” Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc., 106
S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). “This is not
done by merely uttering brief conclusory statements, unsupported by legal citations.” 
Id. In their brief and reply brief, the Daniels do not provide citations to the relevant
authorities nor do they provide citations to facts in the record in support of their
affirmative defense of equitable estoppel or in support of their allegations that Falcon
breached its “implied duty of good faith and fair dealing.” Furthermore, the Daniels’
limited citations to the record do not support the factual assertions they make.


 Thus,
the Daniels have waived this issue for our review.  
          Finally, we note that we have previously addressed, and rejected, the Daniels’
contentions that their profits from the project cannot be disgorged because B&L’s
work was acceptable and Falcon conceded it would have paid a “reasonable profit”
and because Falcon benefitted from the Daniels’ actions by recovering its costs from
a third party. 
          We overrule the Daniels’ fourth issue.
 
 
 
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
 
Panel consists of Justices Nuchia, Jennings, and Higley.