Opinion issued December 18, 2008 




 











 In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00227-CV

____________


CARROLL GRANT, Appellant


V.


LAUGHLIN ENVIRONMENTAL, INC., Appellee






On Appeal from the 164th District Court

Harris County, Texas

Trial Court Cause No. 2002-31315






MEMORANDUM OPINION

 Appellant, Carroll Grant, challenges the trial court's judgment, entered after
a jury trial, in favor of appellee, Laughlin Environmental, Inc. ("LEI"), in Grant's suit
against LEI for breach of contract, fraud, negligent misrepresentation, and quantum
meruit. Grant presents seven issues for our review. In his sixth issue, Grant contends
that the evidence is legally and factually insufficient to support the jury's findings
that he breached his fiduciary duties to LEI, committed fraud against LEI, and
engaged in inequitable conduct. In his fourth issue, Grant contends that the evidence
is legally and factually insufficient to support the jury's finding that LEI did not owe
him a pro-rata field-profit bonus because he had quit his job and LEI did not
terminate his employment. In his fifth and seventh issues, Grant contends that the
trial court erred in granting LEI's motion to disregard the jury's finding in his favor
on his quantum meruit claim and in granting summary judgment in favor of LEI on
his fraud and negligent misrepresentation claims based upon "no evidence." In his
first through third issues, Grant contends that the trial court erred in not performing
"its threshold duty to determine ambiguity of the parties' contract," in "holding that
the contract was ambiguous," and in "permitting parol evidence of the parties' intent
to construe their contract." 

 We affirm.

Factual and Procedural Background

 In his fourth amended petition, Grant alleged that LEI failed to pay him a pro-rata field-profit bonus to which he was entitled after he quit working for LEI. He
asserted claims for breach of contract, quantum meruit, fraud, negligent
misrepresentation, and equitable estoppel.

 In its ninth verified amended answer, LEI alleged that Grant was "not due any
bonus due to the fact [that] he had breached his duties," was "not due monies from
[LEI] due to his breaching of covenants regarding his employment such as loyalty and
honesty," and "breached his duty of loyalty and fiduciary duty to [LEI] thereby
invalidating his rights, if any, to any benefits under his employment with [LEI]."

 At trial, Grant testified that on January 22, 1995, he contracted to work for LEI
as a project manager, and his responsibilities included bidding on, obtaining, and
managing projects. LEI hired Grant "to go out, get more work and . . . bring some
jobs in, bring some dollars in." Grant was the "primary estimator" for LEI, and he
had a lot of "[f]reedom" in conducting his day-to-day operations. Grant recognized
that LEI placed its trust and confidence in him, and he reported directly to Larry
Thyssen, LEI's vice-president, and to Joe Laughlin, LEI's president.

 The 1995 written contract provided that Grant was an employee at will with a
$1,000 weekly salary and a five percent "field-profit" bonus. The contract defined
"field profit" as "gross sales less 10% of gross sales (as an administrative charge) less
field costs." Grant's field-profit bonus accrued "when payment for the services [was]
actually received by [LEI] from the respective customers," and the field-profit bonus
was to "be paid to [Grant] at the completion of each project upon final payment to
[LEI] by the customer." 

 The contract also provided, under the header, "2. Duties of Employee,"

a. Duties. [Grant] is hired as Sales Representative/Estimator/Project
Manager of [LEI] to market and perform remediation services of [LEI]
in the geographical area in which [LEI] currently performs services or
in which [LEI] has made specific plans for doing business in the
immediate future. [Grant] agrees to devote all of [Grant's] time,
attention, and energy in the capacities designated above, subject to the
direction and control of [LEI], and shall to the best of [Grant's] ability
make every effort to market the services of [LEI] in the territory
described above. [Grant] shall assist in the collection of all sums due
from persons to whom the services of [LEI] are rendered and in the
adjustment of any complaints or disputes that may arise in connection
with any services rendered as a result of efforts of [Grant]. [LEI]
reserves the right to change at any time in any manner whatsoever in its
sole discretion the geographical area assigned to [Grant]. 


b. Adherence to Rules. [Grant] at all times during the performance of
this Agreement shall strictly adhere to and obey all the rules and
regulations now in effect or as subsequently modified governing the
conduct of employees at [LEI].The 1995 contract further provided, under the header, "3. Property Rights of the
Parties," 

d. Noncompetition During Term of Employment. During the term of
this Agreement, [Grant] shall not, directly or indirectly, either as an
employee, employer, consultant, agent, principal, partner, stockholder,
corporate officer, director, or in any other individual or representative
capacity, engage or participate in any business that is in competition in
any manner whatsoever with the business of [LEI].


As per the contract, Grant was not to compete against LEI for one year following his
"termination" of employment with LEI.

 On May 1, 1999, Grant and Laughlin signed a "Proposed Compensation
Package beginning May 1, 1999" (the "Compensation Package"). (1) By its terms, the
Compensation Package lasted for two years and governed Grant's compensation for
new work generated after May 1, 1999, while the 1995 contract's terms governed
Grant's compensation for work generated before May 1, 1999. The Compensation
Package also increased Grant's bonus to thirteen percent of the field profits. Grant further testified that, at the time that he left LEI, he was managing for
LEI the Tom Slick Creek Park ("Park") project, a "remediation" project in San
Antonio which had begun in approximately February of 2001; the Conrad Sauer
project, a retention basin project in Houston which had begun in approximately June
of 1999; and the Bush Intercontinental Airport ("Airport") project, a fuel farm
renovation project in Houston which had begun in approximately April of 2000. 
Approximately one month before he left LEI, Grant expressed his concern to Thyssen
that he had not received enough of the field-profit bonus from these projects. 
Thyssen replied that "[t]he jobs will be finished up pretty soon." Thus, still
concerned about obtaining his field-profit bonus, Grant had Tammy Marcontell, LEI's
accountant, who worked directly for Thyssen, provide him with the projects' invoices,
which allowed him to calculate the projects' running costs. Based on these invoices,
after he left LEI in September of 2001, Grant calculated that LEI owed him a field-profit bonus of approximately $130,000 to $140,000 from the Park, Conrad Sauer,
and Airport projects. 

 Grant stated that, before he left LEI on July 26, 2001, Thyssen confronted him
about charging concrete on LEI's credit in order to install a driveway for Jeff and
Loretta Fanning (the "Fannings"). Grant informed Thyssen that the Fannings actually
paid LEI approximately $1,026 on July 10, 2001 for the concrete. Grant conceded
that, in order to install the driveway, he used two LEI employees for approximately
four hours on one day, took four LEI employees off the Airport project for
approximately six hours on another day, and used LEI's trailer. (2) Grant also conceded
that Thyssen had to tell him to record the cost so that LEI could deduct the cost off
of his field-profit bonus. Also, Grant agreed that, on June 7, 2000, he had used LEI's
concrete and three LEI employees for his personal use at his house, but he was "not
sure if" he had to pay LEI back for using the concrete. 

 Grant testified that, for many years, he had used LEI's credit to make personal
purchases at Home Depot and did not inform LEI about these charges until Thyssen
confronted him. Grant conceded that he still had not reimbursed LEI for expenses
incurred on LEI's credit, totaling approximately $3,000 at Home Depot and
approximately $1,000 or more for his personal use. Grant further conceded that he
had routinely used LEI's gas card for personal expenses, even though the
Compensation Package expressly noted that LEI provided Grant with the card only
for "business use." Although LEI had to confront Grant about these various personal
expenses, Grant explained that he did not hide his Home Depot personal purchases
from LEI because he marked these invoices with his "birth date" as a manner of
informing LEI of his use of its credit for personal purposes.

 Grant explained that his use of LEI's credit for personal use was not "stealing"
because it was a common practice for LEI employees to do so, and LEI always
deducted personal costs from his bonus after he had used LEI's credit. He noted, for
example, that Laughlin had previously used LEI's concrete, approximately seven LEI
employees from one of Grant's projects with the City of Houston, and LEI's
equipment to install a carport and walkway at his house. Also, Laughlin had used
seven LEI employees from the Conrad Sauer project for approximately seven days
and LEI's equipment at his daughter's house to remove an old driveway and install
a new driveway in its stead. This new driveway was three times the size of the
driveway that Grant had installed for the Fannings. Grant added that Thyssen had
previously used LEI's employees and equipment to install "piping and stuff" at his
bathhouse. Grant explained that, when Laughlin and Thyssen used employees from
Grant's projects, the cost of the employees' labor was charged to Grant's projects,
which caused a decrease in his field-profit bonus due to increased costs on the
projects. Grant felt "entitled" to use LEI's labor and materials for his personal use
because he was the "number three man" at LEI. However, on cross-examination,
Grant conceded that no one at LEI had told him that he could use LEI's credit. 

 Grant also conceded that in late August or September of 2001, while employed
by LEI, he helped GBS Environmental, Inc. ("GBS") bid for a project with Science
Applications International Corporation ("SAIC"), an engineering firm that works with
the United States Air Force. In the past, Grant had obtained five projects for LEI
from SAIC. Grant explained, however, that, LEI had broken a water line on a SAIC
project in 1998 or 1999. Laughlin, on behalf of LEI, decided not to fix the problem,
and, thus, LEI and SAIC parted on unfriendly terms. 

 Grant explained that, on his own time, he helped Bryan Wierwille, GBS's
president, bid for a project with SAIC because, after the acrimonious breakup
between LEI and SAIC, LEI was not invited to bid for projects with SAIC. Grant,
however, did not provide any further proof to support this assertion. Grant opined
that he did not violate any fiduciary duty to LEI because he solicited the bid for GBS
on his own time, LEI did not have any connections with SAIC, and GBS was not a
competitor of LEI. 

 However, Grant conceded that he had only become familiar with SAIC after
working for LEI. Grant also conceded that, while working on the Park project in San
Antonio, he attended a meeting with SAIC on behalf of GBS and he had used LEI's
company car and cellular telephone to communicate with SAIC. Grant, on cross-examination, also conceded that he did spend at least one-half of an hour bidding on
the SAIC contract for GBS during business hours while he worked for LEI, he
represented to SAIC that GBS employed him, and he permitted GBS to list on its
stationery a list of LEI jobs as references for obtaining the bid from SAIC. Grant
agreed that he did not disclose this bid to LEI and LEI had no way of discovering his
bid with SAIC. Grant also agreed that he did not use his utmost good faith and
honesty with LEI and he had placed his own interests above LEI's interests. Grant
further agreed that he caused damages to LEI by bidding on the SAIC project for
GBS.

 Grant further testified that, on September 17, 2001, because things were going
badly for Grant with LEI and he felt like he was not receiving his field-profit bonuses,
Grant walked into Laughlin's office and quit his job. Grant explained that, while
quitting, he asked Laughlin for his pro-rata field-profit bonus, which Laughlin
refused to pay. However, Laughlin did offer Grant $10,000, which Grant refused. 

 Grant noted that, in 2001, he had approximately $30 million worth of jobs
under contract for LEI that he was managing. Grant could not remember making any
bids on behalf of LEI from February of 2000 until he quit his job, but explained that
the economic environment was "slow." Grant also explained that he did "[n]othing"
to help LEI transition to a new project manager for the Park, Conrad Sauer, and
Airport projects. 

 On January 2, 2002, Grant sent a letter to Laughlin, demanding $117,096.84
in unpaid field-profit bonuses for the unfinished projects. Thyssen responded on
January 21, 2002 for LEI, stating that LEI did not owe anything to Grant because
Grant resigned on his "own desire," and Grant owed LEI $13,029 for the labor and
materials that Grant had used for personal matters during his employment with LEI. 
On cross-examination, Grant conceded that LEI often paid him a field-profit bonus
without a "30% holdback," as called for in his Compensation Package.

 After leaving LEI, Grant went to work for one year at GBS, working on the
SAIC project that he had previously obtained for GBS when he was still employed
by LEI. Grant stated that GBS paid him a $17,000 bonus for the SAIC project. 

 Thyssen testified that, although he was Grant's direct supervisor, Grant
managed the daily costs and operations for each of his projects. Thyssen trusted
Grant to act in the best interest of LEI and felt justified in placing his trust in Grant
because he "had the responsibility to hire and fire and to bind the company." Grant's
responsibility included approving charges for each of his projects. Thus, Thyssen
disputed Grant's assertion that, when he and Laughlin personally used LEI's labor
and materials, they charged the costs to Grant's projects. 

 Thyssen conceded that, by the end of the June 30, 2001 quarter, LEI would
have owed Grant a field-profit bonus. However, Thyssen stated that Grant was not
entitled to his field-profit bonus because he had quit his job and breached his
fiduciary duties to LEI. Thyssen also conceded that LEI had previously deducted
some of Grant's personal purchases from his field-profit bonus and Thyssen was
aware that Grant had purchased concrete for his personal use. However, Thyssen
explained that such personal charges were inappropriate. 

 It was not until after Grant quit his job that Thyssen learned about Grant's use
of the concrete and nine LEI employees to install a driveway for the Fannings over
a three-day timespan. (3)
 Grant never told Thyssen about the project nor did he
reimburse LEI for his use of LEI's equipment and labor. Thyssen estimated the use
of LEI's equipment and labor at $9,500 and noted that LEI would have charged
$14,000 to install the driveway. Thyssen subsequently learned that Grant had also
used LEI's employees to install a driveway at his own house, costing LEI $4,500 for
Grant's use of LEI's equipment and labor. LEI would have customarily charged
$6,000 for the installation of Grant's driveway. After Grant quit his job, Thyssen
received a telephone call from a LEI employee who explained that Grant was working
on a project for SAIC in San Antonio. Thinking that the timing was odd, Thyssen
reviewed Grant's telephone records with LEI and discovered that Grant had used
LEI's cellular and company telephones, starting in April of 2001, to make numerous
calls to SAIC, presumably on GBS's behalf. Thyssen explained that, had he known
of Grant's SAIC bid on GBS's behalf while Grant worked with LEI, he would have
terminated Grant's employment. 

 Laughlin testified that he felt justified in placing his trust in Grant because
Grant had "the authority to spend all of the money necessary to implement [a]
project." However, Grant breached this trust when he was not fair and honest with
LEI. Laughlin explained that SAIC was LEI's customer when Grant bid for a SAIC
project on GBS's behalf. Grant made this bid without LEI's knowledge or
permission. Also, Laughlin disputed Grant's testimony that SAIC no longer accepted
bids from LEI. Laughlin explained that, after LEI broke a water line while working
on a project for SAIC, both sides "mutually agreed" to terminate the job because "the
plans were not accurate" and no ill will existed between the parties. Laughlin added
that he did not have any knowledge of the driveways that Grant had installed for the
Fannings and himself until after Grant quit working for LEI. Because Grant first
breached his fiduciary duty to LEI in June of 2000 when he used LEI's resources to
install a driveway for himself, Laughlin felt like Grant should pay LEI back every
field-profit bonus payment that he had received since June of 2000. 

 Although Laughlin noted that Grant could use his company vehicle for
personal matters, Laughlin explained that it was "[a]bsolutely" against company
policy for LEI's employees to use LEI's credit for their personal use. (4) Laughlin did
concede, however, that he had used LEI's assets to repair his beach house in 1998,
for work at his house, and for work at his daughter's house, but Laughlin explained
that he did not bill these costs to Grant's projects. When asked why "the value of the
amount of [Grant's] improper behavior or outright thievery . . . [was] not important
to [him]," Laughlin replied, "It's a matter of indication of his integrity, and we do not
know what else he might have done or might have taken from us." 

 Laughlin also stated that when Grant quit working for LEI, Grant did not ask
Laughlin for any field-profit bonus payment. Grant surprised Laughlin by asking
Laughlin for a field-profit bonus because it was "clear" to Laughlin that Grant was
not entitled to such a bonus. Also, Laughlin denied ever offering money to Grant
when he quit his job in order to settle any possible field-profit bonus which LEI owed
to him.Jurisdiction

 As a preliminary matter, LEI argues that we lack jurisdiction to consider
Grant's appeal because, although Grant timely filed his notice of appeal from the trial
court's original final judgment, the trial court subsequently modified that judgment,
and Grant did not file another notice of appeal after the trial court modified its
original final judgment.

 On February 8, 2007, the trial court signed its final judgment. On March 8,
2007, LEI filed a motion to modify the judgment, asking the trial court to include
"inadvertently omitted language" and correct a clerical error which stated that the trial
court signed the final judgment on February 8, 2006, rather than February 8, 2007. 
On March 9, 2007, Grant filed his notice of appeal with the trial court. On March 19,
2007, the trial court granted LEI's motion and modified its judgment. Grant did not
file another notice of appeal.

 A party perfects an appeal when the party files its notice of appeal with the trial
court. Tex. R. App. P. 25.1(a). Texas Rule of Appellate Procedure 27.3 further
provides, 

After an order or judgment in a civil case has been appealed, if the trial
court modifies the order or judgment, or if the trial court vacates the
order or judgment and replaces it with another appealable order or
judgment, the appellate court must treat the appeal as from the
subsequent order or judgment and may treat actions relating to the
appeal of the first order or judgment as relating to the appeal of the
subsequent order or judgment.


Tex. R. App. P. 27.3. 

 Under Rules 25.1(a) and 27.3, Grant provided a timely notice of appeal. See
Wohlfahrt v. Holloway, 172 S.W.3d 630, 633-34 (Tex. App.--Houston [14th Dist.]
2005, pet. denied) (holding that appellants properly perfected appeal when appellants
timely filed their notice of appeal after original final judgment, trial court modified
final judgment, and appellants did not file another notice of appeal from modified
final judgment). Accordingly, we hold that we have jurisdiction to consider Grant's
appeal.

Sufficiency of the Evidence

 In his sixth issue, Grant argues that the evidence is "legally and factually
insufficient to sustain the jury's findings that he breached a fiduciary duty
relationship to LEI, committed fraud[,] or engaged in inequitable conduct" because
"the evidence established that [Grant], at all times, acted in accordance with company
policy and was open in dealing with LEI."

 We will sustain a legal sufficiency or "no-evidence" challenge if the record
shows one of the following: (1) a complete absence of evidence of a vital fact, (2)
rules of law or evidence bar the court from giving weight to the only evidence offered
to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. 
City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal
sufficiency review, "a court must consider evidence in the light most favorable to the
verdict, and indulge every reasonable inference that would support it." Id. at 822. 
If there is more than a scintilla of evidence to support the challenged finding, we must
uphold it. Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960
S.W.2d 41, 48 (Tex. 1998). "'[W]hen the evidence offered to prove a vital fact is so
weak as to do no more than create a mere surmise or suspicion of its existence, the
evidence is no more than a scintilla and, in legal effect, is no evidence.'" Ford Motor
Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting Kindred v. Con/Chem,
Inc., 650 S.W.2d 61, 63 (Tex. 1983)). However, if the evidence at trial would enable
reasonable and fair-minded people to differ in their conclusions, then jurors must be
allowed to do so. Keller, 168 S.W.3d at 822; see also King Ranch, Inc. v. Chapman,
118 S.W.3d 742, 751 (Tex. 2003). A reviewing court cannot substitute its judgment
for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable
disagreement. Keller, 168 S.W.3d at 822.

 In conducting a factual sufficiency review, we must consider, weigh, and
examine all of the evidence that supports or contradicts the jury's determination. 
Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989); London v.
London, 192 S.W.3d 6, 14-15 (Tex. App.--Houston [14th Dist.] 2005, pet. denied). 
We may set aside the verdict only if the evidence that supports the jury's finding is
so contrary to the overwhelming weight of the evidence as to be clearly wrong or
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Steinberg v. Comm'n for
Lawyer Discipline, 180 S.W.3d 352, 355 (Tex. App.--Dallas 2005, no pet.); Nip v.
Checkpoint Sys., Inc., 154 S.W.3d 767, 769 (Tex. App.--Houston [14th Dist.] 2004,
no pet.).

 The term "fiduciary" generally applies "to any person who occupies a position
of peculiar confidence towards another," refers to "integrity and fidelity," and
contemplates "fair dealing and good faith." Daniel v. Falcon Interest Realty Corp.,
190 S.W.3d 177, 185 (Tex. App.--Houston [1st Dist.] 2005, no pet.). "'[W]hen a
fiduciary relationship of agency exists between employee and employer, the employee
has a duty to act primarily for the benefit of the employer in matters connected with
his agency.'" Id. (quoting Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 510 (Tex.
App.--Houston [1st Dist.] 2003, no pet.)). He owes his principal the duty not to
compete with the principal on his own account in matters relating to the subject
matter of the agency. Id. A fiduciary also has a duty to deal openly and to fully
disclose to his employer information that affects his employer's business. Id. In sum,
an agent who serves as a fiduciary owes his principal the duty to deal fairly with the
principal, and an agent who uses his position to gain a business opportunity
belonging to the employer commits an actionable wrong. Id. Accordingly, in Daniel,
we held that a project manager and on-site superintendent for a project who was
responsible for soliciting bids owed his employer a fiduciary duty. Id. at 185-86,
187.

 In order to prove fraud, a party must show the following: (1) that a material
representation was made; (2) the representation was false; (3) when the representation
was made, the speaker knew it was false or made it recklessly without any knowledge
of the truth and as a positive assertion; (4) the speaker made the representation with
the intent that the other party should act upon it; (5) the party acted in reliance on the
representation; and (6) the party thereby suffered injury. In re FirstMerit Bank, N.A.,
52 S.W.3d 749, 758 (Tex. 2001).

 Here, the jury found that Grant breached his fiduciary duties to LEI, committed
fraud, and engaged in unlawful or inequitable conduct. Viewing the evidence in the
light most favorable to the verdict, Grant placed his interests above LEI's interests
and he did not exercise utmost good faith. The evidence shows that Grant used LEI's
equipment and labor to build driveways for the Fannings and for himself, used LEI's
telephones to make calls on behalf of a competitor (i.e., GBS), usurped a potential
business opportunity for LEI by obtaining a bid for GBS, used LEI's credit for
personal gas and other purchases, and concealed these actions from LEI. Grant has
not reimbursed LEI for these expenses. 

 As a fiduciary, Grant had the duty to act primarily for the benefit of LEI, not
himself, in matters connected with his employment, and he also had the duty to deal
fairly and openly with LEI and to fully disclose to LEI information affecting LEI's
business. See Daniel, 190 S.W.3d at 185. Grant did not abide by his fiduciary duties. 
By breaching his fiduciary duties and committing fraud, Grant did not have "clean
hands." See Gordin v. Shuler, 704 S.W.2d 403, 408 (Tex. App.--Dallas 1985, writ
ref'd n.r.e.). Moreover, from Grant's self-dealing, a rational jury could have found
that Grant committed fraud based on the evidence that he knowingly represented to
LEI that he would act for the benefit of LEI and then knowingly charged personal
expenses to LEI, competed against LEI, and concealed his self-dealing; furthermore,
the jury could have found that LEI relied upon Grant's representations when it hired
Grant and paid the bills that included Grant's concealed personal expenses. See Cass
v. Stephens, 156 S.W.3d 38, 65 (Tex. App.--El Paso 2004, pet. denied). 
Accordingly, we hold that the evidence is legally sufficient to support the jury's
findings that Grant breached his fiduciary duty to LEI, committed fraud, and engaged
in inequitable conduct. 

 Viewing all the evidence, although Grant testified that he was allowed to incur
personal expenses on LEI's credit and Marcontell, LEI's accountant, testified that it
was an "accepted practice" for senior managers to incur personal expenses on LEI's
credit, Laughlin and Thyssen refuted Grant's and Marcontell's testimony that it was
acceptable for Grant to incur personal expenses on LEI's credit. Also, other than the
credit card purchases at Home Depot, Grant concealed personal expenses on LEI's
credit. Grant has not reimbursed LEI for his personal expenses, but he did assert that
the expenses were supposed to be deducted from his bonus. Even though Grant
testified that he only obtained a bid for GBS because SAIC was not LEI's competitor,
Laughlin and Thyssen testified that SAIC was still LEI's customer. Accordingly, we
hold that the evidence is factually sufficient to support the jury's findings that Grant
breached his fiduciary duty to LEI, committed fraud, and engaged in inequitable
conduct.

 We overrule Grant's sixth issue.

Material Breach

 In his fourth issue, Grant argues that the evidence is legally and factually
insufficient to support the jury's finding that LEI did not owe Grant a pro-rata field-profit bonus because Grant quit his job and LEI did not terminate his employment. 
In his first issue, Grant argues that the trial court erred in not fulfilling its "threshold
duty to determine ambiguity" because "the trial court left open the question of
whether the [trial] court would conclude the contract was ambiguous and whether it
would submit a jury issue on ambiguity." In his second and third issues, Grant also
argues that the trial court erred in determining that the Compensation Package was
ambiguous and permitting LEI to introduce parol evidence because "the contract
language was not susceptible to more than one reasonable interpretation." 

 LEI responds that any error in allowing parol testimony about the contract term
was harmless because "even if the trial court had found in favor of [Grant] on the
issue of ambiguity . . . there would still have been more than sufficient evidence to
support [the] jury finding that Grant violated his contract and so was not entitled to
any bonus." Because the jury's findings support a material breach of contract by
Grant, we hold that any error in the admission of parol evidence was harmless.

 "It is a fundamental principle of contract law that when one party to a contract
commits a material breach of that contract, the other party is discharged or excused
from further performance." Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d
195, 196 (Tex. 2004) (per curiam) (citing Hernandez v. Gulf Group Lloyds, 875
S.W.2d 691, 692 (Tex. 1994)).

 After hearing the evidence, the jury found as follows:

QUESTION 2


Did LEI fail to comply with the AGREEMENT?


Answer: No


QUESTION 6A


Did CARROLL GRANT engage in unlawful or inequitable conduct
concerning the issue in dispute in Questions 5 and 6?

 


Answer: Yes 


QUESTION 7


Did CARROLL GRANT fail to comply with the AGREEMENT?

 

Answer: Yes


QUESTION 8


Was CARROLL GRANT'S failure to comply excused?


Answer: No


QUESTION 10


Did a relationship of trust and confidence exist between LEI and
CARROLL GRANT?


Answer: Yes


QUESTION 11


Did CARROLL GRANT comply with his fiduciary duty to LEI?


Answer: No


QUESTION 13


Did CARROLL GRANT commit fraud against LEI?


Answer: Yes


QUESTION 15


Do you find by clear and convincing evidence that the harm to LEI,
found by you in your answer to Question 12, resulted from fraud?


Answer: Yes


QUESTION 17

 

Do you find by clear and convincing evidence that the harm to LEI,
found by you in your answer to Question 14, resulted from fraud?

 

Answer: Yes 


QUESTION 19

 

Did CARROLL GRANT, without LEI's consent, intentionally solicit,
accept, or agree to accept any benefit from another person on the
agreement or understanding that the benefit would influence his conduct
in relation to the affairs of LEI?


A person acts with INTENT when it is his conscious objective or desire
to engage in the conduct or cause the result.

 

Answer: Yes


In its final judgment, the trial court ordered Grant to pay LEI $5,040 and court costs
and interest. 

 The Texas Supreme Court has held that, even when a jury question asks if a
party "fail[ed] to comply" with a contract, a court can conclude, as a matter of law,
that the party's failure to comply with the contract was also a material one. Id. at
198-99. The Court, in Mustang Pipeline, used the following factors from the
Restatement of Contracts in determining whether a failure to perform was material:

(a) the extent to which the injured party will be deprived of the
benefit which he reasonably expected;


(b) the extent to which the injured party can be adequately
compensated for the part of that benefit of which he will be
deprived;


(c) the extent to which the party failing to perform or to offer to
perform will suffer forfeiture;


(d) the likelihood that the party failing to perform or to offer to
perform will cure his failure, taking account of the circumstances
including any reasonable assurances; [and]


(e) the extent to which the behavior of the party failing to perform or
to offer to perform comports with standards of good faith and fair
dealing.

 

Id. (quoting Restatement (Second) of Contracts § 281 (1981)). 

 Here, the 1995 contract provided that Grant was to "market" LEI's services,
devote his "time, attention, and energy" to his duties as a project manager, adhere to
all of LEI's rules, and not "directly or indirectly" compete against LEI. In addition
to finding that Grant failed to comply with the contract, the jury found that Grant
committed fraud. The jury also found that Grant breached his fiduciary duty to LEI
and engaged in unlawful conduct. 

 Although the 1995 contract provided that Grant was to devote his energy to
obtaining bids for LEI and specifically prohibited him from participating indirectly
or directly with a business in competition with LEI, Grant--on behalf of GBS--bid
for a SAIC project. Grant made successful bids for SAIC projects while working for
LEI. LEI did not discover Grant's SAIC bid on behalf of GBS until after Grant had
quit his job, and LEI would have fired Grant if it had known that Grant had submitted
a bid on behalf of a competitor to one of LEI's current customers. 

 Also, although the 1995 contract called for Grant to adhere to LEI's rules,
Grant used LEI's equipment and labor to install a driveway for himself and for the
Fannings. LEI did not discover Grant's use of its equipment and labor on the
driveway for Grant and the Fannings until after Grant had quit his job, and LEI would
not have permitted Grant to engage in such a practice. Moreover, although Grant
stated that his use of LEI's credit was a permissible practice for LEI's senior
managers, Grant conceded that LEI confronted him about his personal charges in
order to deduct them against his bonus, and Laughlin and Thyssen stated that such
use of LEI's credit by Grant was not permissible. Laughlin explained that the full
extent of damages caused by Grant's improper behavior was simply unknown. 

 Accordingly, we hold that, as a matter of law Grant committed a material
breach of the contract; therefore, LEI was discharged from its duties under the
contract. See Mustang Pipeline, 134 S.W.3d at 200 (holding that, as matter of law,
party's material breach discharged other party from contractual duties); Graco
Robotics, Inc. v. Oaklawn Bank, 914 S.W.2d 633, 640-41 (Tex. App.--Texarkana
1995, writ dism'd) (concluding that bank committed material breach by failing to pay
plaintiff according to escrow agreement based on jury answer that bank "fail[ed] to
comply" with escrow agreement).

 Having so held, we need not directly consider Grant's first through fourth
issues (5) because a prior material breach precludes a party from recovering on the
contract. See Geotech Energy Corp. v. Gulf States Telecomms. & Info. Sys., Inc., 788
S.W.2d 386, 391 (Tex. App.--Houston [14th Dist.] 1990, no writ) (reasoning that
material breach precludes recovery on contract).

 We overrule Grant's first through fourth issues. 

Quantum Meruit

 In his fifth issue, Grant argues that the trial court erred in denying him quantum
meruit relief by "asking the jury to determine whether [Grant's] conduct constituted
unclean hands." Grant also asserts that "a finding of 'unclean hands' does not
preclude [his] recovery in equity."

 

 A party may equitably recover in quantum meruit for goods or services
provided absent a written contract. Vortt Exploration Co. v. Chevron U.S.A., Inc.,
787 S.W.2d 942, 944 (Tex. 1990); Tricon Tool & Supply, Inc. v. Thumann, 226
S.W.3d 494, 502 (Tex. App.--Houston [1st Dist.] 2006, pet. denied). Generally, a
party may recover under quantum meruit only when there is no express contract
covering the services or materials furnished. Vortt, 787 S.W.2d at 944; Tricon, 226
S.W.3d at 502; see Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 684 (Tex.
2000) ("Generally speaking, when a valid, express contract covers the subject matter
of the parties' dispute, there can be no recovery under a quasi-contract theory . . . ."). 
Here, the jury found that Grant breached the written employment agreement made the
basis of his claim. We have concluded that his breach was material. Because an
enforceable written contract existed between the parties that covered Grant's
compensation, the trial court did not err in entering a take-nothing judgment on
Grant's quantum meruit claim.

 We hold that the trial court did not abuse its discretion in denying Grant a
quantum meruit recovery.

 We overrule Grant's fifth issue.

Summary Judgment

 In his seventh issue, Grant argues that the trial court erred in granting "LEI's
'no-evidence' summary judgment motions on [Grant's] causes of action for fraud and
negligent misrepresentation" because Grant "provided sufficient evidence to raise a
genuine issue of material fact regarding each element of his causes of action for fraud
and negligent misrepresentation." 

 LEI filed no-evidence summary judgment motions, arguing that it was entitled
to summary judgment on Grant's fraud and negligent misrepresentation claims
because Grant proffered no evidence supporting any of the elements of fraud and
negligent misrepresentation. On January 5, 2005, in his response to LEI's no-evidence summary judgment motions, Grant proffered his deposition testimony and
his own affidavit. 

 On January 5, 2005, in his affidavit, Grant testified that, in order to calculate
his bonus based on field profits, Thyssen provided him with periodic statements,
which showed the expenses and profits for the jobs that Grant had managed. Grant
stated,

Because these statements were given to me by [LEI's] [v]ice [p]resident,
who had access to all of the company's books, I relied upon the
information provided to me as accurately showing the expenses and
profits for the jobs I managed, and the amount of bonus that was owed
to me. . . . In the course of this lawsuit, I have learned that the
information that [LEI] provided to me was not correct, and under-reported the amount of bonus that was owed to me. [LEI's] expert
witness, who is the company's outside accountant, had to correct [LEI's]
calculations regarding the bonus owed to me. [LEI's] own expert says
that the company still owes me a bonus I earned but which has not been
paid to me.


Grant also asserted in his response that he satisfied the elements of negligent
misrepresentation.

 On January 13, 2005, LEI filed a "Reply to [Grant's] Responses to [LEI's]
Motions for Summary Judgment." LEI asserted that Grant did not point to any
specific intent to defraud. LEI also attached an excerpt from Grant's deposition,
during which the following exchange occurred:

[LEI]: Okay. So, my question to you is, is there anything specific,
examples of something that Joe Laughlin said or Larry
Thyssen said that was untrue that you relied upon to your
detriment when y'all were working on calculating up the
bonuses that were going to be due per this Exhibit A[,] [the
Compensation Package,] while you were employed there?


[Grant]: No. Let's just say no on this one here. . . .


[LEI]: Okay. But you're not alleging that they[,] [Thyssen or
Laughlin,] negligently misrepresented any of the contents
of this[,] what costs go where on a particular job?


[Grant]: I--I can't answer that question. I mean-- 


[LEI]: Well, let me just ask you. I mean, do you know what
"reckless" means?


[Grant]: No. Why don't you tell me what it means.


[LEI]: How about like carelessness? That's kind of close. Maybe
it's not quite as-- 


[Grant]: Carelessness?


[LEI]: Reckless might be worse than careless but more or less the
same.


[Grant]: Right.


[LEI]: Do you know of any specific acts of outright carelessness
by [Marcontell] or [Laughlin] or [Thyssen] in regards to
the way they treated the accounting or the allocation of job
costs?


[Grant]: I haven't seen the--the--the breakdown that [LEI] has sent
to our office or sent to [my attorney].


[LEI]: Okay. Well, I'm not really concerned about reviewing
stuff that we've produced. I'm just asking, you know, your
firsthand knowledge working there for eight years.


[Grant]: Uh-huh.


[LEI]: Did you feel that there was an ongoing pattern or ongoing
culture at [LEI] to where they were reckless and careless
and would apply invoices incorrectly to wrong jobs and
just let the chips fall where they may? They didn't give a
crud?


[Grant]: Oh, no, no, no. [Thyssen] was very astute about costs.


LEI also asserted that Grant presented no evidence of negligent misrepresentation.

 To prevail on a no-evidence summary judgment motion, a movant must allege
that there is no evidence of an essential element of the adverse party's cause of action
or affirmative defense. Tex. R. Civ. P. 166a(i); Fort Worth Osteopathic Hosp., Inc.
v. Reese, 148 S.W.3d 94, 99 (Tex. 2004). We review a no-evidence summary
judgment under the same legal sufficiency standard used to review a directed verdict. 
Gen. Mills Rests., Inc. v. Tex. Wings, Inc., 12 S.W.3d 827, 832-33 (Tex.
App.--Dallas 2000, no pet.). Although the non-moving party is not required to
marshal its proof, it must present evidence that raises a genuine issue of material fact
on each of the challenged elements. Tex. R. Civ. P. 166a(i); Ridgway, 135 S.W.3d
at 600. A no-evidence summary judgment motion may not be properly granted if the
non-movant brings forth more than a scintilla of evidence to raise a genuine issue of
material fact on the challenged elements. Ridgway, 135 S.W.3d at 600. More than
a scintilla of evidence exists when the evidence "rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions." Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).

 When reviewing a no-evidence summary judgment motion, we assume that all
evidence favorable to the nonmovant is true and indulge every reasonable inference
and resolve all doubts in favor of the nonmovant. Spradlin v. State, 100 S.W.3d 372,
377 (Tex. App.--Houston [1st Dist.] 2002, no pet.). Because the trial court's order
granting LEI's no-evidence summary judgment motion does not specify the grounds
upon which the trial court relied, we must affirm the summary judgment if any of the
grounds in the summary judgment motion are meritorious. FM Props. Operating Co.
v. City of Austin, 22 S.W.3d 868, 872-73 (Tex. 2000).

 Conclusory statements in an affidavit are not proper summary judgment
evidence. See Tex. R. Civ. P. 166a(f) (supporting affidavit must set forth such facts
as would be admissible in evidence); see also Ryland Group, Inc. v. Hood, 924
S.W.2d 120, 122 (Tex. 1996) (per curiam). A conclusory statement is one that does
not provide the underlying facts to support the conclusion. 1001 McKinney Ltd. v.
Credit Suisse First Boston Mortgage Capital, 192 S.W.3d 20, 27 (Tex.
App.--Houston [14th Dist.] 2005, pet. denied). To serve as competent summary
judgment proof under Texas Rule of Civil Procedure 166a(c), an affidavit of an
interested party must be "clear, positive, direct, credible, free from contradiction, and
susceptible of being readily controverted." Haynes v. City of Beaumont, 35 S.W.3d
166, 178 (Tex. App.--Texarkana 2000, no pet.); see Trico Techs. Corp. v. Montiel,
949 S.W.2d 308, 310 (Tex. 1997). An affidavit that makes self-serving, conclusory
statements without any underlying factual detail cannot support a summary judgment. 
Haynes, 35 S.W.3d at 178. Finally, an objection that an affidavit is conclusory is an
objection to substance that may be raised for the first time on appeal. Id. 

 As noted above, a fraud cause of action has six elements: (1) that a material
representation was made, (2) the representation was false, (3) when the representation
was made, the speaker knew it was false or made it recklessly without any knowledge
of the truth and as a positive assertion, (4) the speaker made the representation with
the intent that the other party should act upon it, (5) the party acted in reliance on the
representation, and (6) the party thereby suffered injury. FirstMerit Bank, 52 S.W.3d
at 758. A negligent misrepresentation cause of action has four elements: (1) the
representation is made by a defendant in the course of his business, or in a transaction
in which he has a pecuniary interest, (2) the defendant supplies "false information"
for the guidance of others in their business, (3) the defendant did not exercise
reasonable care or competence in obtaining or communicating the information, and
(4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.
Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 686 n.24 (Tex. 2002).

 Viewing Grant's summary judgment evidence in the light most favorable to
Grant, Grant offers no evidence of LEI's intent to falsify the statements which LEI
provided Grant in order to prevent Grant from obtaining his bonus. Also, Grant
offers no evidence that LEI did not exercise reasonable care or competence when it
provided Grant with the periodic statements or that Grant justifiably relied on these
statements. In his affidavit, Grant made the conclusory statement that he relied on
LEI. However, in his deposition testimony, Grant testified that he did not rely upon
anything that Laughlin or Thyssen provided him when calculating his bonuses from
the 1999 contract. Grant also testified that LEI did not carelessly, knowingly, or
recklessly falsify the periodic statements which they provided him with in order to
calculate his bonus. See Farroux v. Denny's Rests., Inc., 962 S.W.2d 108, 111 (Tex.
App.--Houston [1st Dist.] 1997, no pet.) (reasoning that, when only affirmative
evidence of claim is subsequent affidavit which contradicts earlier deposition
testimony without explanation for change of testimony, summary judgment is proper
because affidavit "presents merely a 'sham' fact issue"). Accordingly, we hold that
the trial court did not err in granting LEI's no-evidence summary judgment motions
on Grant's claims for fraud and negligent misrepresentation.

 We overrule Grant's seventh issue.

Conclusion

 We affirm the judgment of the trial court.








 


 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


1. Both parties agreed that the 1995 contract and the Compensation Package must be
read together and construed as a single contract. See Fort Worth Indep. Sch. Dist. v.
City of Fort Worth, 22 S.W.3d 831, 840 (Tex. 2000) (recognizing that courts may read
separate documents that pertain to same transaction as one contract). Both parties
also agreed that, although the Compensation Package, which was written to last for
two years, expired on May 1, 2001, the Compensation Package's terms continued to
govern Grant's compensation. See Sieber & Calicutt, Inc. v. La Gloria Oil & Gas
Co., 66 S.W.3d 340, 347 (Tex. App.--Tyler 2001, pet. denied) (reasoning that when
parties implicitly waive exact date of performance, the law will imply reasonable time
for duration of contract, and that extension of one term of contract extends all of its
provisions).
2. Kent Ducote, an employee for LEI, testified that Grant "had got something," i.e., side
payments, for performing his side jobs.
3. Admire Kadenge, an employee for LEI, testified that he told Thyssen about how
Grant, in July of 2001, had him install a driveway for someone.

4. Tammy Marcontell, LEI's accountant, testified that LEI had an "accepted practice"
of allowing senior managers to incur personal expenses on LEI's credit, which the
company then charged back to the senior manager.
5. In his first through fourth issues Grant contended that the evidence was legally and
factually insufficient to support the jury's finding that LEI did not owe Grant a pro-rata field-profit bonus because Grant quit his job, the trial court erred in not
performing its "threshold duty" to determine ambiguity "one way or another" before
submitting a question on ambiguity to the jury, the trial court erred in determining that
the Compensation Package was ambiguous, and the trial court erred in allowing LEI
to introduce parol evidence.