Opinion issued July 22, 2010.

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of Appeals

For The

First District of Texas

————————————

NO. 01-08-00854-CV

———————————

Todd Esse,
Brent Esse, and 5E Oil and Gas Corporation, Appellants

V.

Empire
Energy III, Ltd., BP American Production Company, and Kenneth Havis, Trustee in
Liquidation for Westgate Energy Partners, Inc., Appellees



 



 

On Appeal from the 234th District
Court

Harris County, Texas



Trial
Court Case No. 0321829

 



 

O P I N I O N

          Appellants, Brent and Todd Esse and 5E
Oil and Gas Corporation (collectively the Esses), appeal the trial court’s July
15, 2008 judgment against them in the breach of contract action filed by
appellees, Empire Energy III, Ltd. (Empire), BP American Production Company
(BP), and Kenneth Havis as the trustee in liquidation for Westgate Energy
Partners, Inc. (Westgate).  In five
issues, the Esses argue that the trial court erred in: (1) concluding that Todd
and Brent Esse had the specific malicious intent necessary for liability under
fraudulent transfer, conspiracy, breach of fiduciary duty, or usurpation
theories; (2) holding Todd and Brent Esse personally responsible for damages under
the fraudulent transfer theory; (3) finding that Todd and Brent Esse usurped
corporate opportunities by forming another corporation to do what Westgate
could not; (4) finding that 5E was Westgate’s alter ego; and (5) requiring Todd
and Brent Esse to pay the Trustee’s attorney’s fees.  The Esses also filed separate briefing
addressing the trial court’s June 5, 2009 Judgment Nunc Pro Tunc, arguing that
judgment is void as a matter of law because the trial court lacked plenary
power and jurisdiction to change anything other than clerical mistakes in the
July 15, 2008 judgment and the requested changes did not address a clerical
error.

          We affirm.

Background

          On March 1, 2002, BP and Empire[1] entered into a joint
operating agreement (JOA) in which each company had a 50% working interest in
certain energy exploration and production endeavors, particularly in a prospect
known as the Preston 811 #1 Well, in Yoakum County, Texas (Preston well).  BP was designated as the operator.  Article VII, Section B, of the BP-Empire
contract grants BP a security interest in Empire’s and any of its assignees’
shares of the Preston well assets, allowing BP to recover operating costs upon
payment defaults by Empire or Westgate: 

Each Non-Operator grants to [BP] a lien upon its oil
and gas rights in the [Preston well], and a security interest in its share of
oil and/or gas when extracted and its interest in all equipment to secure
payment of its share of expense . . . . 
[U]pon default by any Non-Operator in the payment of its share of
expense,  [BP] shall have the right . . .
to collect from the purchaser the proceeds from the sale of such Non-Operator’s
share of oil and/or gas until the amount owed by such Non-Operator, plus
interest, has been paid. The non-defaulting parties, including [BP] shall . . .
pay the unpaid amount in the proportion that the interest of each such party
bears to the interest of all such parties. 
Each party so paying its share of the unpaid amount shall, to obtain
reimbursement thereof, be subrogated to the security rights described in the
foregoing paragraph.   

 

Empire then
contacted Daniel Boone, a petroleum engineer who knew Empire principal Dennis
Ferstler, to express its desire to sell half of its interest in the Preston well.  Boone had also had previous business
relations with Todd Esse,[2] and Boone informed the
Esses of Empire’s interest in selling part of its interest in the well.  After consulting with Boone, the Esses
incorporated Westgate on March 21, 2002 as an “S” corporation, with Brent and
Todd each owning half the shares.  Brent
subsequently distributed a portion of his shares to his four children, making
Todd the majority shareholder.  Todd was
also a significant source of Westgate’s capital.  Brent was an officer and director of Westgate,
and he was the only other source of Westgate’s capital.  Around the same time, Westgate also acquired
interests in another property known as the Fitzgerald/Mallet Prospect.

Prior to
the commencement of drilling on the Preston Well, Boone and Brent Esse attended
an operator’s meeting at BP.  Boone
signed a Data Secrecy Agreement in which he agreed, among other things, that “[he]
shall be solely responsible for any actions which [he] takes, or advises others
to take, in reliance upon Information furnished by BP,” that BP made no
warranties with respect to the information or subject matter of the operator’s
meeting, and that none of the disclosed information “is or shall be relied upon
as a promise or representation or warranty, whether as to past, present or
future.”  Brent Esse maintains that
during this meeting BP assured him that it would not use “slick water”[3] in its operations of the
well.  However, none of the written
agreements contain any provisions or agreements regarding the use of slick
water.[4]

BP provided
Westgate with an Authority for Expenditure that estimated the costs to drill
and equip the Preston well at $749,700.  In
May 2002, Empire conveyed half of its interest to Westgate, thus giving Westgate
a 25% working interest in the well, retaining a 25% interest for itself, and
leaving BP as owner of the other 50% interest. 
The assignment from Empire to Westgate expressly provided that Westgate
was bound by the terms of the original JOA, including the provision that BP
would function as the operator and the provisions that non-defaulting parties
could be called upon by the operator to pay any unpaid amounts owed by a
defaulting party in the proportion of their interest.  Westgate also agreed “to pay its proportionate
share of all costs, including but not limited to, the costs of leases . . . and
drilling, evaluation, completion, testing and equipping” the Preston well and
to “protect, defend, indemnify and hold [Empire] harmless from all claims,
damages, expenses or other costs incurred as a result of the claims or judgments
arising as a result of [Westgate’s] ownership or operation of the Properties
assigned. . . .”  Pursuant to this
agreement, Westgate paid a $20,000 “promotional fee” to Empire and paid an
additional $13,000 to Empire, representing 25% of the operating cost already
incurred in acquiring the Preston lease. 
BP was not a party to this agreement between Empire and Westgate.

          Starting in May 2002, as operations at the well progressed,
BP sent monthly Joint Interest Billings to Westgate and Empire detailing the
expenses and invoicing their share of the costs.  In a June 24, 2002 Operating Agreement, Westgate
and Empire both elected in writing to participate in the completion of the
well, obligating Westgate to pay an additional $59,375 for its portion of the
completion costs.  Following the election
to complete the Preston well, Westgate continued to receive billings from
BP.  Westgate never paid any money
pursuant to these statements.  At no time
did Westgate ever have capital in excess of $69,063.

Upon its
completion, the well never produced significant amounts of oil and, by the end
of 2002, the parties involved realized that production from the well would not compensate
for the drilling costs anytime in the near future.  Westgate subsequently refused to pay its
share of the costs for the Preston well, arguing that the Esses and Boone had
been misled by BP about the use of slick water, which they alleged was a breach
of contract.  

          In late 2002, BP billed Westgate for its share of the costs
associated with the well, and Westgate refused to pay.  In January 2003, BP billed Empire under their
operating agreement for one-third of Westgate’s portion of the dry hole costs,
and BP bore the remaining two-thirds of Westgate’s portion of the dry hole costs.  BP and Empire made phone calls and numerous
other demands for payment from Westgate. 


          On December 11, 2002, Westgate offered to buy BP out of its
interests in the Preston well and another nearby well, the Nelson well, for
$30,000 total, rather than paying its share of the Preston well costs.  However, in a January 14, 2003 letter, BP
rejected Westgate’s buyout offer and insisted that Westgate pay its share of
expenses, estimated at $130,408.93.  

On January
3, 2003, Westgate paid Boone $10,000 for consultation Boone had done in March
2002 regarding the Mallet prospect.  Westgate described this payment as an expense
reimbursement, a prospect development fee and a fee for engineering supervision
that was part of an oral agreement it had entered into with Boone in the summer
of 2002. 

On January
14, 2003, BP sent a letter to Brent Esse at Westgate demanding that Westgate
pay its share of the Preston well costs and threatening to “pursue any and all
other remedies” if it did not. 

On January 28,
2003, Brent Esse consulted with the law firm Hughes, Watters & Askanase
(HWA) about how to protect the Mallet prospect from Westgate’s creditors and about
how to put Westgate in bankruptcy once Mallet was transferred.  The law firm identified Brent Esse as its
client and identified Westgate as an adverse party.  

          On January 30, 2003 and over the next few days, Brent Esse
and a partner at HWA discussed “structuring of ownership of new oil and gas
investments,” and the partner did work regarding “making an assignment of an
oil and gas lease” and “asset transfer issues.” 
On February 12, 2003, HWA advised Brent Esse on the transfer of the
Mallet prospect. 

During
interactions with BP and Empire in February 2003, the law firm identified
itself as Westgate’s lawyer, and Westgate paid the bills sent by the law firm
from March 2003 until March 2004.  After
March 2004, when Westgate’s funds were exhausted, Todd Esse began paying the
law firm’s bills.

On February
13, 2003, the Esses formed Esse Oil & Gas Corp., which was later renamed 5E
Oil and Gas.  5E was in most ways
identical to Westgate—it was
formed for the same business purpose of oil and gas development, Todd and Brent
Esse were the only source of capital, it was owned by the same parties, and the
incorporation document listed the same address, phone number, president, and
tax structure.  It also employed the same
consultant as Westgate.  

On February
19, 2003, Westgate transferred its interests in the Mallet prospect to 5E in
exchange for a payment of $37,715.  The
money 5E paid to Westgate for the Mallet prospect was used by Westgate to pay
the legal expenses billed by the law firm.

          On September 11, 2003, BP filed suit against Westgate,
Brent Esse, and Todd Esse seeking a declaratory judgment of the rights and
obligations of the parties under the Preston well JOA and alleging claims for
breach of contract, piercing the corporate veil and alter ego, fraud, punitive
damages, and attorney’s fees.  BP
eventually added causes of action alleging conspiracy and fraudulent transfer.

          On October 14, 2004, Westgate filed for chapter 7
bankruptcy.  The bankruptcy court
appointed Havis as trustee of the bankruptcy estate.  Subsequently, Empire and Havis joined BP’s
suit against Westgate, Brent Esse, Todd Esse, and 5E.  BP, Empire, and Havis as Westgate’s trustee
all employed the same counsel.  Havis, as
Westgate’s bankruptcy trustee, moved to nonsuit Westgate’s counterclaim against
BP, and on December 21, 2006, the trial court dismissed Westgate’s breach of
contract counterclaim against BP.

          The remaining claims were tried in a bench trial in
February 2008.  Regarding BP and Empire’s
causes of action, the trial court concluded that Westgate was liable for breach
of contract and fraudulent transfer, that Brent Esse and Todd Esse were both
liable for fraudulent transfer and conspiracy to commit fraudulent transfer;
and that 5E was liable “as if it were the alter ego of Westgate” for fraudulent
transfer and conspiracy to commit fraudulent transfer.  Regarding Westgate’s and Havis’s causes of
action against the Esses and 5E, the trial court concluded that Brent Esse and
Todd Esse were both liable for breach of fiduciary duty/self dealing and for
usurping corporate authority and that 5E was also liable for fraudulent
transfer and conspiracy to commit fraudulent transfer and for conspiracy to
breach fiduciary duties owed to Westgate by Brent Esse and Todd Esse.

          The trial court also found that:

·       
Brent Esse was the controlling shareholder and only director of Westgate,
in addition to being its president and only employee.

 

·       
Todd Esse was only a shareholder in Westgate, nothing more.

 

·       
Prior to entering into the agreement with Westgate, BP and Empire
performed absolutely no due diligence with respect to the financial viability
or abilities of Westgate and sought no personal guaranties from the Esses.

 

·       
Westgate never had more than $70,000 in capital while it was doing
business.

 

·       
Westgate made payments of $20,000 and $13,640 pursuant to its agreement
with Empire prior to the execution of the agreements.

 

·       
Westgate failed to pay any of the costs to drill, complete, test, equip,
and operate the Preston well after its initial payments of $33,640 despite
demands for such payment from both BP and Empire.

 

·       
5E was incorporated by the Esses on February 19, 2003, only after they
had received demands from Plaintiffs for payment of the costs to drill and
complete the Preston well in January of 2003.

 

·       
The decision to incorporate 5E was made by Brent and Todd Esse and
benefitted them personally.

 

·       
The Mallet prospect was transferred by Westgate to 5E on February 19,
2003 for $37,715.

 

·       
The transfer of the Mallet prospect was made after the Esses had
received, on Westgate’s behalf, demands from BP for payment of over $200,000 in
costs from the Preston well that Westgate had not previously paid.

 

·       
Ferstler, a principal of Empire, testified that the Mallet Prospect
should have been valued at approximately $80,000, and Boone, the Esses’ petroleum
engineer, testified that the interest should have been valued at approximately
$78,000.  Thus, the value received by
Westgate for the Mallet prospect “was less than half of the actual value” of
the interest.

 

·       
The Mallet prospect “was transferred only to hinder or delay Westgate’s
creditors or to put the [Mallet prospect] beyond the reach of Westgate’s
creditors.

 

·       
On January 3, 2003, Westgate paid Boone $10,000 “for what was described
at trial as engineering work” on the Mallet prospect.

 

·       
Westgate had previously paid Boone nothing for any of the previous work
he had done on the Preston well or the Mallet prospect, and the work for which
he was paid the $10,000 had been done more than nine months before the payment
was made.

 

·       
By the date of the payment to Boone, the Preston well “had been completed
and in operation long enough for Boone and the Esses to become dissatisfied
with the production from the well.”

 

·       
The payment to Boone “did not return any reasonably equivalent value to
Westgate because the payment was for work done on an asset Westgate would not
soon own and would never reap the benefit of.”

 

·       
The $10,000 payment to Boone was a fraudulent transfer.

 

·       
HWA was paid $35,597.75 from Westgate’s operating account from March 2003
through March 2004.

 

·       
The source of the funds Westgate used to pay HWA was the proceeds of the
sale of the Mallet prospect to 5E.

 

·       
Between March 2003 and March 2004, HWA was “simultaneously representing
Westgate, Brent and Todd Esse individually, Daniel Boone individually, 5E, and
another entity owned by Boone.”

 

·       
HWA sent only one invoice, addressed to Brent Esse, every month for its
services rendered in connection with Empire and BP’s demands for payment, and
none of the invoices “differentiated services or charges rendered on behalf of
Westgate as opposed to services or charges rendered on behalf of Brent and Todd
Esse individually, Daniel Boone individually, 5E and another entity.”

 

·       
“From the inception of their representation of Westgate, HWA acknowledged
that Westgate was either an actual or potential adverse party to Brent Esse.”

 

·       
“Most of the services rendered by HWA . . . through the end of February
2004 . . . were for the sole benefit of their clients other than Westgate.”

 

·       
There was no determination or votes by the board of directors or
shareholders of Westgate to indemnify either Brent or Todd Esse, and the Esses
never affirmatively pled indemnification as an affirmative defense to
fraudulent transfer.

 

·       
Westgate did not receive reasonably equivalent value for $26,465 of the
attorney’s fees it paid to HWA because the services provided did not directly
or indirectly benefit Westgate.

 

·       
“BP and Empire’s claims against Westgate arose before the transfer of the
[Mallet prospect] to 5E was made, before the $10,000 payment from Westgate to
Boone was made, and before Westgate issued any checks to HWA.”

 

·       
These three transfers “were, taken together, substantially all of
Westgate’s assets” and Westgate was made insolvent by these transfers.

 

·       
“5E, Boone, and HWA were ‘insiders,’ as that term is defined in [Texas
Business and Commerce Code section] 24.002(7), as to Westgate on the date of
the transfers.”

 

·       
“Brent and Todd Esse assented to and benefited from these transfers” and
knowingly participated in the wrongdoing.

 

          The trial court’s final judgment, signed on July 15, 2008,
awarded BP and Empire $224,158 from Westgate in contract damages.  Specifically, it “ordered that Plaintiffs BP American Production and Empire
Energy, III, Ltd. have and recover from Defendants Westgate Energy Partners
$224,158.00 representing amounts owed under the contract between Empire and
Westgate and the Court’s finding of alter ego.” 
The trial court also awarded pre-judgment interest on this amount.  The trial court also awarded Westgate and
Kenneth Havis $76,750 from Brent, Todd, and 5E “representing amounts owed for
fraudulent transfer of assets,” together with pre-judgment interest.  

          Regarding attorney’s fees, the trial court’s final judgment
provided:

[It is] ORDERED that Westgate and Havis have
and recover from Brent and Todd Esse and 5E, jointly and severally, the sum of
$150,000.00 as attorneys fees for the services of their counsel through completion
of trial.  It is further,

 

ORDERED that in the event this case is
unsuccessfully appealed by Defendants to the Court of Appeals, then Plaintiffs,
Westgate and Havis shall have and recover from Brent and Todd Esse and 5E
jointly and severally the sum of $25,000.00 as fees for the services of their
counsel in the Court of Appeals.

 

The judgment also awarded
the recovery of additional attorney’s fees by “Plaintiffs, Westgate and Havis”
from “Brent and Todd Esse and 5E, jointly and severally, the sum of $4,000” in
the event of an unsuccessful petition for review to the Texas Supreme Court and
an additional $18,000 in the event the petition were to be granted and briefing
on the merits required but were ultimately to prove unsuccessful.  The judgment also awarded post-judgment
interest and costs against the defendants, jointly and severally, and concluded
that “[a]ll other relief not specifically granted or denied in this judgment is
denied.”  

          The Esses and 5E filed this appeal of the trial court’s
July 15, 2008 judgment on October 22, 2008.

          BP, Empire, and Westgate filed a motion for entry of
judgment nunc pro tunc on April 28, 2009, after appellate briefing was
submitted to this Court.  On June 5,
2009, the trial court entered a Nunc Pro Tunc Judgment that stated, “BP
American Production and Empire Energy, III, Ltd. have and recover from
Defendants Westgate Energy Partners and
5E Oil & Gas Corp. $224,158.00 representing amounts owed under the
contract between Empire and Westgate and the Court’s finding of alter ego.”
(emphasis added).  The June 5, 2009
judgment also stated that Westgate and Havis’s recovery of $76,750 was “for
fraudulent transfer of Westgate’s assets.” 
Regarding attorney’s fees, the June 5 judgment provided “that both
plaintiffs Westgate and Havis” recover $150,000 for attorney’s fees “for the
services of their counsel through completion of trial,” $25,000 for attorney’s
fees “for the service of their counsel in the Court of Appeals,” and $4,000 for
attorney’s fees “for the services of their counsel in the Supreme Court of
Texas.”  Finally, the June 5, 2009
judgment provided that “both plaintiffs, Westgate and Havis shall have and
recover from Brent and Todd Esse and 5E, jointly and severally the sum of
$18,000, as fees for the services of their counsel in the Supreme Court” in the
event the supreme court orders full briefing on the merits and the defendants
are ultimately unsuccessful on appeal.

Judgment Nunc Pro Tunc

BP, Empire,
and Havis as trustee for Westgate filed a motion requesting that we take
judicial notice of the trial court’s June 5, 2009 judgment nunc pro tunc.  The Esses argue that the June 5, 2009
judgment is void because the trial court’s plenary power had expired and the changes
made to the judgment amounted to more than a correction of a clerical error.

          Texas Rule of Civil Procedure 329b(d) provides that a trial
court has plenary power for 30 days after a judgment is signed to grant a new
trial or to vacate, modify, correct, or reform the judgment.  Tex.
R. Civ. P. 329b(d).  However, Rule
316 provides:

Clerical mistakes in the record of any judgment may
be corrected by the judge in open court according to the truth or justice of
the case after notice of the motion therefor has been given to the parties
interested in such judgment, as provided in Rule 21a, and thereafter the
execution shall conform to the judgment as amended.

 

Tex.
R. Civ. P. 316.  Thus, after a trial court
loses its jurisdiction over a judgment, it can correct clerical errors in the
final judgment by signing a judgment nunc pro tunc, but it cannot correct a
judicial error made in rendering final judgment.  Escobar
v. Escobar, 711 S.W.2d 230, 231 (Tex. 1986).  Whether an error in a final judgment is a
judicial or clerical error is a question of law.  Id. at
232.  When deciding whether a correction
is of a judicial or a clerical error, we look to the judgment actually
rendered, not the judgment that should or might have been rendered.  Id. at
231.

A clerical
error is a discrepancy between the entry of a judgment in the record and the
judgment that was actually rendered and does not arise from judicial reasoning
or determination.  Hernandez v. Lopez, 288 S.W.3d 180, 184 (Tex. App.—Houston [1st
Dist.] 2009, no pet.).  A judicial error
occurs in the rendering, as opposed to the entering, of a judgment and arises
from a mistake of law or fact that requires judicial reasoning to correct.  Id.
at 184–85.  The court can only correct by
judgment nunc pro tunc the entry of a final written judgment that incorrectly
states the judgment actually rendered.  Escobar, 711 S.W.2d at 231–32.  Judicial errors may not be corrected after the
trial court loses plenary power.  Riner v. Briargrove Park Property Owners,
Inc., 976 S.W.2d 680, 682 (Tex. App.—Houston [1st Dist.] 1996, no writ).  A judgment rendered to correct a judicial
error after plenary power has expired is void. 
Hernandez, 288 S.W.3d at 185; Riner, 976 S.W.2d at 682.

Here, BP,
Empire, and Westgate argued in their motion for entry of judgment nunc pro tunc
that the final judgment rendered on July 15, 2008 contained clerical
errors.  Specifically, they argued that
the trial court “awarded plaintiffs damages pursuant to its breach of contract
action against Westgate and its alter ego claims against defendant 5E.  However, the award of contractual damages is
made only against Westgate, and not 5E.” 
They also argued that the trial court’s failure to award BP and Empire
attorney’s fees for services rendered through the completion of trial was a
clerical error because BP and Empire were included as recipients of the
conditional appellate attorney’s fees.  BP,
Empire, and Westgate point to the trial court’s findings that 5E was liable as
the alter ego of Westgate and that BP, Empire, and Havis as Westgate’s trustee
were all entitled to attorney’s fees.  

The trial
court’s June 5, 2009 judgment subsequently ordered that BP and Empire could
recover the amounts owed on their breach of contract claim from Westgate and
from 5E.  However, the omission of 5E as
a party liable for the breach of contract claims was an error in rendering the
judgment, not an error in the entry of judgment.  The addition of 5E as another party against
whom BP and Empire could collect for breach of contract goes beyond the
correction of a clerical error.  Indeed,
a judgment awarding various sums of money to several plaintiffs is “a solemn judicial
act on the part of the Court.”  C & S Truck Line v. Valentine, 640
S.W.2d 341, 342 (Tex. App.—Beaumont 1982, no writ).   

The trial
court’s June 5, 2009 judgment also changed the award of attorney’s fees to
include BP and Empire in addition to Westgate and Havis. The wording awarding both
Westgate and Havis attorney’s fees likewise constituted more than correction of
clerical error.  An award of damages,
interest, or attorney’s fees may not be substantively and materially changed by
a judgment nunc pro tunc.  See Riner, 976 S.W.2d at 683.  

          Thus, we grant the motion to take judicial notice of the
June 5, 2009 judgment nunc pro tunc but hold that it is void.  We consider only the trial court’s July 15,
2008 judgment.

Standard of Review

          In
an appeal of a judgment rendered after a bench trial, the trial court’s
findings of fact have the same weight as a jury’s verdict, and we review the
legal sufficiency of the evidence used to support them just as we would review
a jury’s findings.  Daniel v. Falcon
Interest Realty Corp., 190 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.]
2005, no pet.) (citing Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex.
1994)).  In conducting a
legal-sufficiency review, we credit favorable evidence if a reasonable fact-finder
could and disregard contrary evidence unless a reasonable fact-finder could
not.  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005); Brown v. Brown, 236 S.W.3d 343, 348
(Tex. App.—Houston [1st Dist.] 2007, no pet.). 
We consider the evidence in the light most favorable to the finding
under review and indulge every reasonable inference that would support it.  City of Keller, 168 S.W.3d at
822.  We must sustain a no-evidence
contention only if: (1) the record reveals a complete absence of evidence of a
vital fact; (2) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the
evidence establishes conclusively the opposite of the vital fact.  Id. at 810; Merrell Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).

          In reviewing a challenge to the
factual sufficiency of the evidence, we must consider and weigh all the
evidence and should set aside the judgment only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  Arias v. Brookstone, L.P., 265
S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)). The trial court acts as
fact-finder in a bench trial and is the sole judge of the credibility of
witnesses.  HTS Servs., Inc. v.
Hallwood Realty Partners, L.P., 190 S.W.3d 108, 111 (Tex. App.—Houston [1st
Dist.] 2005, no pet.).

 

Fraudulent Transfer

In their
first issue, the Esses argue that the trial court erred in finding that Todd
and Brent Esse had the specific malicious intent necessary for fraudulent
transfer, conspiracy, breach of fiduciary duty, or usurpation of corporate opportunity
theories.  Specifically, they argue that
they are protected by the fact that they took action based on the advice of
counsel and that their conduct could not have been malicious if they were
advised by counsel that the transactions were legally permissible.[5]  

In their
second issue, the Esses argue that the evidence was legally and factually
insufficient to support the trial court’s finding that Todd and Brent Esse made
fraudulent transfers or had conspired to do so. 
Specifically, Todd and Brent argued that they were neither the
transferor nor the transferee and thus could not be personally liable for
fraudulent transfer and that they lacked the requisite intent.

We consider
these issues together.

 

A.  
Intent to Defraud Under the Fraudulent Transfer Act

 

The Esses argue that the evidence supporting the trial court’s findings
that the sale of the Mallet prospect to 5E, the $10,000 payment to Boone, and
the attorney’s fees paid to HWA were fraudulent transfers was legally and
factually insufficient because “Todd and Brent lacked the requisite intent to
harm under either prong of the fraudulent transfer act” because “lawyers guided
them through each transaction and advised the Esses that their actions were
permissible under Texas law.”

1. Malicious
Intent

A fraudulent transfer is a transfer by a debtor with
the intent to hinder, delay, or defraud his creditors by placing the debtor’s
property beyond the creditor’s reach.  Tex. Bus. & Com. Code Ann. §
24.005(a)(1) (Vernon 2009) (“A transfer made or obligation incurred by a debtor
is fraudulent as to a creditor, whether the creditor’s claim arose before or
within a reasonable time after the transfer was made or the obligation was
incurred, if the debtor made the transfer or incurred the obligation
. . . with actual intent to hinder, delay, or defraud any creditor of
the debtor.”); Hahn v. Love, No.
01-07-00096-CV, 2009 WL 793637, at *5 (Tex. App.—Houston [1st Dist.] Mar. 26,
2009, pet. denied) (citing Nobles v. Marcus, 533 S.W.2d 923,
925 (Tex. 1976)). 


 

However, the Texas Uniform Fraudulent Transfer Act (TUFTA) also provides:

A transfer made or obligation incurred by
a debtor is fraudulent as to a creditor whose claim arose before the transfer
was made or the obligation was incurred if the debtor made the transfer or
incurred the obligation without receiving a reasonably equivalent value in
exchange for the transfer or obligation and the debtor was insolvent at that
time or the debtor became insolvent as a result of the transfer or obligation.

 

Id. § 24.006(a).  Thus, a transfer may still be shown to be
fraudulent without any actual intent on the part of the debtor to hinder,
delay, or defraud a creditor if the provisions of section 24.006(a) are
met.  See
id.

          The
Esses do not challenge the trial court’s finding that (1) BP and Empire’s
claims arose before the three transfers for which the Esses were held liable;
nor do they challenge the trial court’s finding that (2) the transfers “were, taken together,
substantially all of Westgate’s assets” and that Westgate was made insolvent by
these transfers.  This unchallenged
evidence is sufficient to establish liability under section 24.006(a) of the TUFTA
if there is sufficient evidence to establish that (3) appellants failed to
receive reasonably equivalent value for the transfers complained of.  See id.  Under the plain language of the statute, a transaction can be considered a fraudulent
transfer under section 24.006(a) without a finding of “malicious intent” or any
actual intent to defraud.  See id.; Glenney v. Crane, 352 S.W.2d 773, 775 (Tex. Civ. App.—Houston 1961,
writ ref’d n.r.e.); see also United
States v. Corpus, 491 F.3d 205, 210 (5th Cir. 2007).  Thus there was no need for appellees to prove
that the Esses had fraudulent intent in order for them to be found liable for
fraudulent transfer under section 24.006(a).

          2. Advice of Counsel

The Esses
also contend that they cannot be held liable because they relied on the advice
of counsel.  The Esses cite the Texas
Business Corporations Act, articles 2.41 and 2.42, arguing that “Brent Esse was
entitled to these statutory protections for corporate directors.” See Tex.
Bus. Corp. Act Ann. art. 2.41 (Vernon Supp. 2009), art. 2.42 (Vernon
2003) (providing for liability of directors and shareholders of a corporation
in certain cases and for officers of a corporation).  However, this argument was not included in
the pleadings and was not presented in the trial court, and thus is
waived.  See Tex. R. App. P.
33.1(a).  Morever, Texas law does not
recognize any common law defense allowing a debtor who has made a fraudulent
transfer to escape liability because he relied on the advice of counsel, nor do
the Esses cite any support for this proposition.  Therefore, this contention is likewise
waived.  See Tex. R. App. P.
38.1(i).

          We overrule appellants’ first and second issues to the
extent they contend that proof of intent was required to establish appellants’
liability for fraudulent transfer under the circumstances of this case.  Therefore, we address whether the evidence
was sufficient to support the trial court’s findings that Westgate made the
transfers without receiving a reasonably equivalent value in exchange.

B.  
Reasonably Equivalent Value

1.     The transfer of the Mallet Prospect

The Esses
argue that 5E paid fair market value for the transfer of the Esses’ interest in
the Mallet prospect to it and that the trial court’s valuation of the prospect
as worth $78,000 “has no legitimate foundation.”  However, the Esses’ own witness, Daniel
Boone, testified that the Mallet prospect was properly valued at $78,000.  Ferstler, a principal of Empire, likewise
presented separate testimony that the value of the Mallet prospect at the time
Westgate transferred it to 5E was $80,000.[6]

The
uncontested evidence demonstrated that 5E paid $37,715 for the Mallet
prospect.  The testimony of Boone and
Ferstler was legally sufficient to support the trial court’s finding that the
amount received by Westgate “was less than half the actual value” of the
interest, and, thus, Westgate did not receive reasonably equivalent value in
exchange for its transfer of the Mallet prospect to 5E.  See
City of Keller, 168 S.W.3d at 822, 827 (we credit favorable evidence if
reasonable fact-finder could, consider evidence in light most favorable to
finding under review, and indulge every reasonable inference that would support
it).  Furthermore, the Esses’ appellate
brief does not cite to any evidence supporting their valuation of the Mallet
prospect.  Thus, we cannot say that,
after considering and weighing all the evidence, that the trial court’s finding
was so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust, and thus the evidence in support of the trial court’s finding
was factually sufficient as well.  See Arias, 265 S.W.3d at 468.

2.     $10,000 payment to Boone

The Esses
argue that Westgate’s $10,000 payment to Boone for engineering work on the
Mallet prospect was not a fraudulent transfer. 
They argue that “5E reimbursed Westgate for the $10,000 payment to Boone
when the Mallet prospect sale occurred as that amount was included in the purchase
price.”  The Esses also argue that this
was a legitimate expense incurred by Westgate. 

The
evidence presented at trial indicated that this payment was made to Boone nine
months after he performed the engineering work on the Mallet prospect, that Boone
had not been previously paid for any of his consulting work on the Preston well
or the Mallet prospect, and that Westgate transferred the Mallet prospect to 5E
just a month after it made the payment to Boone.  This evidence is sufficient to support the
trial court’s finding that Westgate did not receive reasonably equivalent value
from the payment it made to Boone.  See City of Keller, 168 S.W.3d at 822,
827.  

The Esses’
argument that Westgate was compensated for the $10,000 payment to Boone because
that amount was included in the price 5E paid for the Mallet prospect also
fails.  We have already upheld the trial
court’s finding that Westgate received less than half the value of the Mallet
prospect even before taking into account the money Westgate spent on Boone’s
engineering work on that prospect.  We
cannot say that, after considering and weighing all the evidence regarding this
transfer, the trial court’s finding was so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust.  See
Arias, 265 S.W.3d at 468.

3.     Payments to HWA

The Esses argue that the payments
to HWA were for Westgate’s benefit, and that Todd Esse had loaned Westgate the
money to pay those obligations up until 5E purchased the Mallet prospect.  They further argue that Todd Esse then
resumed paying those obligations after the proceeds from the sale of the Mallet
prospect were exhausted.  Finally, they
argue that they were entitled to prefer one creditor over another.  The Esses present no legal argument or authority
in support of their claims.  They are
thus inadequately briefed and are waived. 
See Tex R. App. P. 38.1(i).

4.     The Esses’ liability as persons for whose
benefit the transfers were made

Finally, the
Esses argue that the Fraudulent Transfer Act does not authorize Westgate’s
trustee to recover damages from Brent or Todd because they were not the
transferor, transferee, or a person for whose benefit the transfer was made,
because the transactions were not for Todd or Brent’s direct, personal benefit.  They argue, “Certainly, as shareholder[s],
the transfer was of benefit to the Esses, but that is not enough to hold them
responsible under the fraudulent transfer statute,” and they also argue that to
do so “would contravene the statutory imperative that, absent actual fraud or
an express agreement to assume personal liability, a shareholder may not be
held liable for corporate obligations.”

The trial
court found that “Brent and Todd Esse assented to and benefited from these
transfers.”  The uncontested evidence
demonstrates that members of the Esse family were the only shareholders of both
Westgate and 5E, with Brent and Todd controlling the vast majority of the
shares of both.  Thus, their actions
resulted in more than just an incidental or indirect benefit to them.  Under the plain meaning of the statute, Brent
and Todd Esse were both “person[s] for whose benefit the transfer was made.”  See Tex. Bus. & Com. Code Ann.
§ 24.009(b)(1) (Vernon 2009) (providing that judgment under TUFTA may be
entered against “the first transferee of the asset or the person for whose
benefit the transfer was made”). 
Although the Esses argue that the benefit they received as shareholders
in 5E is not enough to hold them responsible under the fraudulent transfer
statute, they cite no authority supporting their proposition, and this argument
is therefore waived.  Tex. R. App. P. 38.1(i).

          We overrule the Esses’ first and second issues.

Alter Ego

In their
fourth issue, the Esses argue that the trial court erred in characterizing 5E
as Westgate’s alter ego, thus making it also liable for the fraudulent
transfers.  However, 5E is not liable for
the fraudulent transfers because it is the alter ego of Westgate; rather, it is
liable because it was the recipient of the transfers.  See Tex. Bus. & Com. Code Ann.
§ 24.009(b)(1).  Moreover, no
damages for fraudulent transfer were awarded against 5E as Westgate’s alter ego
in the original July 15, 2008 judgment.   

Although the
trial court’s finding that 5E was the alter ego of Westgate would have been relevant
had the trial court entered judgment against 5E on BP and Empire’s breach of
contract claims against Westgate, we have already determined that the trial
court was without plenary power when it substantively and materially amended
the July 15, 2008 judgment by awarding BP and Empire contract damages against
5E in its June 5, 2009 judgment, and that judgment is therefore void.  Thus, this issue is moot.

We overrule
the Esses’ fourth issue.

Breach of Fiduciary Duties

In their
third issue, the Esses argue that the evidence is legally and factually
insufficient to support the trial court’s finding that Todd and Brent Esse
breached their fiduciary duties to Westgate. 
However, this was an alternative theory, and the Esses admit that “the
trial court entered judgment on the fraudulent transfer claims,” while arguing only
that “the fiduciary duty claims fail for the same reasons discussed above.”  They also complain about the trial court’s
findings of usurpation of corporate opportunity.  

None of
these findings was necessary to support the Esses’ liability for fraudulent
transfer about which they complain on appeal. 
Because no relief is sought from any action of the trial court in
entering these findings and we have already sustained the trial court’s
findings as to the Esses’ liability for fraudulent transfer, this issue is
moot.

Attorney’s Fees

          In their fifth issue, the Esses argue that the trial court
erred in awarding attorney’s fees to Havis, the trustee for Westgate.

          Parties claiming attorney’s fees must “segregate fees
between claims for which they are recoverable and claims for which they are
not” and are “required to show that attorney’s fees were incurred while suing
the defendant sought to be charged with the fees on a claim which allows
recovery of such fees.”  Tony Gullo Motors I, L.P. v. Chapa, 212
S.W.3d 299, 311 (Tex. 2006) (quoting Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991)).  However, an exception to the duty to segregate
attorney’s fees applies when “claims aris[e] out of the same transaction and
are so interrelated that their ‘prosecution or defense entails proof or denial
of essentially the same facts.’”  See Stewart Title Guar. Co., 822 S.W.2d at
11 (quoting Flint & Assoc. v.
Intercont’l Pipe & Steel, Inc., 739 S.W.2d 622, 624–25 (Tex.
App.—Dallas 1987, writ denied)).

          Here,
when the Esses placed Westgate in bankruptcy after suit had been filed against
them by Empire and BP, all causes of action in this lawsuit against Westgate’s
corporate fiduciaries and for improper use and transfer of its assets became
the property of the bankruptcy trustee, Havis, and subject to collection by him.  See
11 U.S.C.A. § 548 (a)(1) (West
2004 & Supp. 2010) (empowering trustee to avoid fraudulent transfers); § 704(a)(1)
(West Supp. 2010) (requiring trustee to “collect and reduce to money the
property of the estate for which such trustee serves”); La. World Expo. v. Fed. Ins. Co., 858 F.2d 233, 246 (5th Cir. 1988)
(holding that trustee is bound to assert cause of action pursuant to section
704(a) if doing so would maximize value of estate).  Havis authorized the continuation of the suit
against the Esses and 5E, and he hired Chris DiFerrante, BP and Empire’s
attorney, to prosecute the Plaintiffs’ and Westgate’s claims against the Esses
and 5E. 

          The trial court found that Westgate and Havis
were entitled to attorney’s fees for bringing Westgate’s fraudulent transfer
cause of action against the Esses and 5E. 
The trial court also found that BP and Empire were entitled to
attorney’s fees on their breach of contract action and on the fraudulent
transfer claims.  Finally, the trial court found that there was “no evidence or legally
insufficient evidence” for it to determine what amount of attorney’s fees
“spent or actually incurred in this case” applied to the breach of contract
action and which applied to the fraudulent transfer cause of action.  The trial court’s July 15, 2008 order awarded
Westgate and Havis $150,000 from the Esses and 5E, jointly and severally, for
“attorney’s fees for the services of their counsel through completion of trial.”

          In
order to prove a claim for fraudulent transfer of Westgate’s assets, the
trustee had to prove (1) that a transfer made by Westgate was fraudulent as to
a creditor whose claim arose before the transfer was made, (2) Westgate made
the transfer without receiving a reasonably equivalent value in exchange, and (3) Westgate
was insolvent at that time or became insolvent as a result of the transfer.  Tex.
Bus. & Com. Code Ann. § 24.006(a). 
Specifically, the trustee had to prove that the Esses’ transfer of corporate
funds to pay Boone, the transfer of payment for the Mallet prospect, and the
transfer to HWA were made after the claims of breach of BP and Empire, Westgate’s
creditors, had arisen under their contracts with Westgate.  Thus, proof of BP’s and Empire’s breach of contract
claims against Westgate was required in this case to establish an essential
element of the trustee’s fraudulent transfer claim, and that claim could not be
proved without proof of the intertwined contract claims.  

          The
trustee, Havis, is clearly entitled to attorney’s fees for successfully
prosecuting Westgate’s fraudulent transfer cause of action under section 24.013
of the Fraudulent Transfer Act, which provides, “In any proceeding under this
chapter, the court may award costs and reasonable attorney’s fees as are
equitable and just.”  Id. §
24.013 (Vernon 2009).  Likewise, BP and
Empire are entitled under section 24.013 to recovery of attorney’s fees for the
successful prosecution of the breach of contract action that served as the
necessary foundation for the fraudulent transfer action.  See
id. (permitting recovery of such fees
as are “equitable and just”).  Moreover,
the same attorney, DiFerrante, represented the bankruptcy trustee, Havis, and
BP and Empire in continuing and successfully completing the prosecution of the fraudulent
transfer and contract action begun by BP and Empire against Westgate that
resulted in the judgment awarded against the Esses and 5E.  Nor was it necessary, or even possible, that
the fees be segregated.  Rather, the exception
to the duty to segregate attorney’s fees applies because the trustee’s and BP
and Empire’s “claims aris[e] out of the same transaction and are so
interrelated that their ‘prosecution or defense entails proof or denial of essentially
the same facts.’”  See Stewart Title Guar. Co., 822 S.W.2d at 11.  

          We
overrule the Esses’ fifth issue.

Conclusion

          We affirm the judgment of the trial court.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and
Wilson.[7]

 











[1]
          Apparently an entity related to
Empire III, also identified as Empire in the pleadings, originally entered into
the deal with BP and subsequently transferred half of its interest to
Westgate.  Immediately after Empire
transferred half of its interest to Westgate, it assigned its remaining
interest to Empire III.  We refer to this
corporation simply as “Empire” for the sake of clarity.

 





[2]
          Boone and his company, Image
Energy, borrowed $100,000 from Todd Esse in 2001, a debt that remained
outstanding throughout the events that form the basis of this suit.  After BP and Empire filed suit against
Westgate and the Esses, Todd Esse forgave the interest on this loan.

 





[3]
          Slick water is a water base
fluid with a gel polymer added to give a friction reduction benefit.  Appellants contend that this polymer additive
can affect the permeability of certain underground formations, making it more
difficult for oil or gas to reach the wellhead. 

 





[4]
          BP and Empire contest that any
agreement was ever made, and, to the extent that they did discuss the use of
slick water, BP stated only that it would refrain from using slick water during
the drilling phase of well operations. 
The evidence introduced at trial indicated that slick water was used
during the completion phase of the well and not during the drilling phase.





[5]
          We note that the trial court entered judgment
in favor of BP and Empire on their breach of contract claim against Westgate,
and it entered judgment in favor of Westgate and Havis, as trustee, on the
fraudulent transfer claims against the Esses and 5E.  The Esses only attack the portion of the
judgment awarding Westgate and Havis damages for fraudulent transfer, and they
do not address or complain about any one finding of fact or conclusion of law,
so we limit our analysis to any findings that were necessary to support the
trial court’s judgment on the claim of fraudulent transfer.

 





[6]
          The Esses’ brief raises
complaints concerning Boone’s and Ferstler’s qualifications to testify about
the value of the property.  It seems that
the Esses are attempting to argue that the trial court erred in admitting
Boone’s and Ferstler’s testimony on the value of the property.  However, they cite no case law or authority
supporting their contentions on this point, so it is waived.  See Tex. R. App. P. 38.1(i).  To the extent that the Esses are complaining
that Boone’s and Ferstler’s testimony was not credible, we likewise find their
arguments unavailing.  The trial court,
as fact finder, is the sole judge of the weight and credibility of a witness’s
testimony.  HTS Servs., Inc. v. Hallwood Realty Partners, L.P., 190 S.W.3d 108,
111 (Tex. App.—Houston
[1st Dist.] 2005, no pet.).





[7]           The Honorable Davie Wilson, retired
Justice, Court of Appeals, First District of Texas at Houston, participating by
assignment.